THE PEOPLE OF THE STATE OF NEW YORK *vs.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, and ROBERT T. HAWS, comptroller of said city.

Where there is a clear violation of law, or a clear misuser or abuse of its corporate powers, on the part of a municipal corporation, it is an appropriate ground for an injunction.

Where an act threatened to be done is one of serious consequence to the public, such as the execution of leases for ferry privileges, for a term of years, which leases, if made, will confer rights of property, and the fact of their having been actually granted might present embarrassment in the way of their being subsequently set aside, the preventive remedy by injunction may be resorted to.

The people, as representing the general public — the body of citizens who are aggrieved — are the proper parties to enforce such remedy.

A lease of a ferry, executed by the corporation of the city of New York, which requires twenty per cent of the annual rent to be paid at the time of the sale of the privilege; that security be given only for the remainder; that there be a bid equal to the present aggregate amount of the rent of the ferries, as a condition of purchase; that the lessees shall keep, on each ferryboat, a fire apparatus or force pump, with hose, to be used for the extinguishment of fires, under the direction of the chief engineer, for which the lessees are to be compensated at the rate of twenty dollars per hour, is not, by reason of those provisions, a violation of the 41st section of the amended charter of 1857. (*Laws of* 1857, *ch.* 446.)

A sale or lease of the five ferries between the cities of New York and Brooklyn, together, the purchaser being required also to purchase the entire ferry property attached to all the ferries, is not a violation of the act of 1857, either in letter or spirit. There is nothing which forbids a sale in that form, or requires a sale of the ferries, or of the ferry property, separately; and the mode of sale is left to be governed by a sound discretion.

Title to property is always held upon the implied condition that it must be surrendered to the government, either in whole or in part, when the public necessities, evidenced according to the established forms of law, demand.

In regard to *ferries* there is a still further right which the public may exercise, to wit: the right of regulating the rates of ferriage, and of so controlling ferry franchises and privileges in the hands of grantees or lessees, that they shall not be abused, to the serious detriment or inconvenience of the public. The grantees of ferries, or ferry rights, must be deemed to accept the grants subject to these implied conditions.

When the New York and Brooklyn ferries or ferry rights were conveyed to the Mayor, Recorder, Aldermen and Commonalty of New York, by the colonial governors, Dongan, Cornbury and Montgomerie, the grantees took the same subject to this governmental regulation and control. On the change

The People *v.* The Mayor &c. of New York.

of government from a colony to a state, this right passed to the supreme power in the state; and it may now be manifested and exercised by the legislature acting for the people in their sovereign capacity.

And although the corporation of New York should execute to a grantee a lease of those ferries, unqualified in its terms, and silent as to the prices which should be charged for ferriage, except in respect to the maximum rate specified in the notice of sale, those rates would still be subject to legislative supervision and control, and the lessees would take the same subject to such qualification. *Per* HOGEBOOM, J.

While the regulation of the rates of ferriage upon the New York and Brooklyn ferries is within the control of the legislature, and, so long as those rates are not regulated by them, they are the proper subject of regulation, by the city government, or of contract between the corporation and its lessees, it is a very different question whether, and to what extent, it ought to be interfered with by the courts. *Per* HOGEBOOM, J.

Where a regulation fixing the maximum rate of ferriage, for foot passengers, at two cents, is alleged to be an abuse of corporate power, if the matter is so plain that it will amount to fraud, or palpable oppression upon the citizens who shall have occasion to cross the ferry, it seems a court of equity should interfere. *Per* HOGEBOOM, J.

But it seems that a mere difference of opinion between the court and a municipal corporation, as to the proper rate of ferriage to be charged, ought not to induce an interference by injunction; especially where the erroneous judgment of the corporation, if it exists, may be corrected by an appeal to the legislature.

Such a power, if it exists in the courts, ought to be most cautiously exercised.

The corporation of New York is by its charters, taken in connection with its subsequent action under the same, vested with the property of certain ferries, and with the right to establish others. Incident to that right, in the absence of legislative action, must be the right to establish rates of ferriage.

And the matter being left to the discretion of the corporation, it may exercise such discretion by passing resolutions fixing the maximum rates of ferriage, as effectively as by the passage of a local law, for that purpose.

The act of May 14, 1845, to establish and regulate ferries between the city of New York and Long Island, was by operation of law, repealed by the amended charter of New York, granted in 1857.

MOTION for an injunction. The facts sufficiently appear in the opinion of the court.

*L. Tremain, J. W. Gilbert, P. S. Crook* and *J. W. Edmonds,* for the plaintiffs.

*W. M. Evarts* and *Moses Ely,* for the defendants.

*By the Court,* HOGEBOOM, J. This is an application by the plaintiffs for an injunction to restrain the defendants from granting any lease or leases of the Fulton, Catharine street, South, Hamilton avenue and Wall street ferries, between the cities of New York and Brooklyn, and especially to restrain them from making the same in the manner proposed in the public notice of the sale thereof by the comptroller, under date of November 16, 1859.

The application is founded on two general grounds : 1. That by the act of May 14, 1845, the defendants have no authority to make any sale or lease of the ferries in question, but that the same is confided to commissioners appointed by the governor. 2. That if the defendants have the power of sale or lease, they are conducting the same in violation of the amended charter of the city of New York, of April 14, 1857, and also in violation of the duties imposed upon them as a municipal corporation, to the public at large. It will be convenient to consider first, this last branch of the application.

If the plaintiffs have in fact established a clear violation of law, or a clear misuser or abuse of their corporate powers, on the part of the defendants, I regard it as an appropriate ground for an injunction. The threatened act is one of seri· ous consequence to the public. The leases, if made, confer rights of property, and are to last for ten years, and the fact of their having been actually granted, might present embarrassment in the way of their being subsequently set aside. Under these circumstances the preventive remedy is not only lawful, but is the safest and best which can be adopted. (*Story's Com. on Eq. Jur.* §§ 907, 8, 9. *Code,* § 219. *Benson* v. *Mayor &c. of New York,* 10 *Barb.* 226. *Davis* v. *Mayor &c. of New York,* 14 *N. Y. Rep.* 506. *Milhau* v. *Sharp,* 17 *Barb.* 445.)

I think too, the people are the proper parties to enforce the remedy. They represent the general public — the body of citizens who are aggrieved. An individual would not be authorized to institute the action. Probably the commissioners,

under the act of 1845, would be regarded as possessing a mere naked authority to lease, not coupled with an interest. Their lessees, if any there be, which does not appear, might doubtless, if the act be in force, sue for a violation of their rights ; but I doubt if even such an action would bar a suit by the people, instituted by their attorney general, to prevent violations of charters, of general laws, and of common law obligations, tending to the irreparable injury and prejudice of the citizens at large. Especially is this so, when it does not appear that there are any lessees under the act of 1845 ; nor that they are disposed to institute such an action ; and when the very nature of the remedy in part sought—the prevention of excessive rates of ferriage—is one which such lessees might not feel inclined to enforce. (*Doolittle* v. *The Supervisors of Broome County*, 18 *N. Y. Rep.* 160. *People* v. *Mayor &c. of New York*, 9 *Abbott*, 253. *Hale* v. *Cushman*, 6 *Metcalf*, 425. *Roosevelt* v. *Draper*, 16 *How. Pr. Rep.* 137. 7 *Abbott*, 108. *Mann* v. *Westover*, *Sup. Court*, 3*d dist.*)

Waiving for the present a discussion of the question, whether the law of 1845 is valid or is in force, let us next consider the question whether the defendants have been guilty of such a violation of their common law or statutory duties or obligations as justifies the interference of this court. The 41st section of the amended charter of 1857, (*Laws of 1857*, *ch.* 446,) requires all ferries to be leased, and the leases to be made by public auction and to the highest bidder who will give adequate security, to be limited to, that is not to exceed, ten years in duration, and to be revocable by the common council for mismanagement or neglect to provide adequate accommodations—the lessees to · purchase, at a fair appraised valuation, the boats, buildings and other necessary ferry property of the former lessees—previous notice of all such sales (and leases) to be given under the direction of the comptroller for thirty days in each of the daily newspapers employed by the corporation.

It is claimed on the part of the plaintiffs, that by the terms

of the proposed lease, this section has been violated in several particulars; in requiring twenty per cent of the annual rent to be paid at the time of the sale; in requiring security only for the remainder; in requiring a bid equal to the present aggregate amount of the rent of the ferries, as a condition of purchase; in requiring the lessees to keep on each ferry boat a fire apparatus, or force pump, with hose, to be used for the extinguishment of fires, under the direction of the chief engineer, for which the lessees are to be compensated at the rate of $20 per hour.

I cannot discover in any of these provisions a violation of the statute in question. The provisions of the law are general —not entering into much detail—imposing certain restrictions and obligations, but not prohibiting other and additional ones. The leading object of the section was to secure publicity of notice—free competition at the sale—and in the limited duration and revocable character of the leases, protection to the public. To require a certain moderate sum to be paid in cash at the time of the sale, was not an unreasonable or unusual requirement, and was advisable, if not necessary, to prevent fraudulent bids. Nor do I think it violated the provision that the sale should be to the highest bidder, who should give adequate security. This provision must receive a reasonable construction. It was not intended, I think, as compulsory on the corporation to take security for the entire amount, but for such amount as in the exercise of a sound discretion they should think reasonable. It might be literally complied with by a condition of sale which should require the whole purchase money to be paid the next week after security was given; but that would be unreasonable. So of the requisition to pay or bid, at the time of the sale, an amount equal to the present annual rental of the ferries, ($56,000,) as a condition of purchase. This does not violate the section which requires a sale to the highest bidder. If the highest bid be for a sum less than that amount, the only consequence is, that there is no sale; and a new advertisement, perhaps on more favorable

terms, becomes necessary. Nor is the condition an unreasonable one. It evinces a just regard for the interests of the city. It is not pretended that the rent is unreasonable in amount, and it expressly appears that it does not exceed a fair rent of the public slips and piers for commercial purposes.

The provision requiring the lessees, for a proper compensation, to have attached to the fire engine on each boat a fire apparatus and hose, is certainly not a violation of the section above referred to, for it says nothing about it, and I cannot regard the provisions therein made for the benefit of the lessees and the public, as exclusive or prohibitory of other just and salutary conditions, not inconsistent therewith, imposed by the corporation of New York for the benefit of their constituents. I regard this particular condition as not unreasonable, having in view the frequency of fires in the vicinity of the landing places of these boats, and the convenience of operating the fire apparatus by means of the engines upon the boats. It is, I think, a police regulation, competent for the defendants to make. It may be said, also, in reference to all the before mentioned alleged violations of this section, that none of them appear to be in derogation of the rights of the general public, or that particular public more immediately represented by the defendants, and, therefore, scarcely afford ground for interference by injunction at the suit of the people, with the action of the defendants in these particulars.

The other principal objections to the proposed sale or lease of the ferries are, that they are proposed to be *leased together* in a single lease; that the purchaser is required to purchase the entire ferry property attached to the five ferries; that the rate of ferriage allowed to be charged for foot passengers is extravagant and oppressive, and that the proposed mode of leasing is the result of a fraudulent combination between the defendants and the Union Ferry Company, having for its object to destroy competition, and to confer upon the last named company a substantial monopoly of the ferry privileges.

These are the more important allegations in the case, and

require the consideration of two questions: *First.* How far these allegations are founded in fact; and *Second.* How far they justify the interference of this court.

They are claimed to be, in part, violations of the act of 1857, and, in part, violations of the general obligations or duties resting upon the defendants as a municipal corporation towards the public.

There is no express provision in the notice that the ferries shall be sold together, but it is fairly to be inferred from the terms of the notice, and is necessary to be done in order to comply with the resolutions of the common council. Such a sale is not a violation of the act of 1857, either in letter or spirit. There is nothing which forbids a sale in that form, and it is left to be governed by a sound discretion. How far such discretion may be regulated or controlled by the action of the courts, is a question which I shall hereafter discuss. For the present I shall consider the question of fact.

The affidavits on the part of the plaintiffs tend to show that the ferries could be profitably run at a charge of one cent for foot passengers, and that responsible persons are ready to take a lease of the ferries upon that condition, paying the present rental to the city of New York; and that a proposal so to run the same was presented to the defendants by the public authorities of Brooklyn; and that the chief manager of the Union Ferry Company has admitted that they could be so run at one and a half cents ferriage for each foot passenger —and at one cent if some of the night boats were removed from certain of the ferries—that some of said ferries were heretofore run at a charge of one cent for foot passengers, and were remunerative at such a price. It further satisfactorily appears that the said ferries are run at the present time at two cents per foot passenger; that the population of Brooklyn is 250,000 to 280,000; that the number of foot passengers per day averages 70,000, or more, and from 25,000,000 to 33,000,000 per year; that the foot passengers yield about 81 per cent of the whole income of the ferries; that at the charge

of two cents for foot passengers, the ferries, over and above the necessary expenses of running the same, pay the annual rents of $56,000 to the city of New York, a clear income of at least 8 per cent on $800,000, the alleged amount of capital invested, (claimed by the plaintiffs to exceed by $200,000 the actual amount needed for the proper maintenance of the ferries,) and that the ferry company have on hand a surplus of $100,000 or thereabouts, to meet claims for damages and other contingent expenses. It is further alleged on the part of the plaintiffs, that putting up the ferries for sale or lease together, requires not only the purchase (according to the terms of sale) of the entire ferry property of the present ferry company, exceeding $500,000 in value, but also an aggregate amount of purchase money and security, which only a combination of wealthy citizens can supply, and is thus directly and effectually calculated to destroy competition; and that the whole proceedings on the part of the defendants, thus tend to oppression and injustice, and constitute a misuser and abuse of their corporate rights and obligations.

The affidavits on the part of the defendants tend to show that the fair annual rent of the property of the defendants now used by the Union Ferry Company in running the ferries in question is $55,000; that the ferries are well conducted, and run at a uniform rate of ferriage; that this uniform rate is highly promotive of the public convenience, if not absolutely essential to the lives and safety of passengers, in preventing the more accessible of them from being over-crowded; that the Fulton ferry would rent for more, if rented alone, than the whole five ferries together, including the Fulton, and that the public safety and accommodation as well as the interests of both the cities of New York and Brooklyn will be best consulted by having them all under one uniform management, and conducted by a single interest.

These affidavits are to some extent, though not to a very great extent, conflicting, except in regard to the opinions of the several deponents. From the best consideration that I

have been able to give to them, I am satisfied, in the first place, that in the projected proceeding of the defendants there is no violation of the charter of 1857. There is no provision requiring a sale of the ferries, or of the ferry property separately, nor forbidding a sale of them together. Unless, therefore, a sale in the latter mode would be highly prejudicial to the public interests or convenience, or inequitable to that degree which would bring it fairly within the grasp of a court of equity, I ought not to interfere—for it is to be observed, that no complaint is made that the corporate authorities of New York are guilty of a breach of trust towards their constituents— and therefore, the ground for equitable interposition does not exist, which arises when a trustee or other person standing in a fiduciary relation is doing some act to the prejudice of the parties whom he immediately represents. Hence it is not like the cases of *Milhau* v. *Sharp*, (15 *Barb.* 193;) *Stuyvesant* v. *Pearsall*, (*Id.* 244,) and other parallel cases. Accordingly, the ground upon which an injunction must rest, must either be that the defendants are guilty of a violation of law, or of misuse or abuse of corporate privileges or obligations; or of some breach of trust which they owe to the general public, represented by the people, and which courts are bound to protect. It is highly probable that the great value of the property, and the magnitude of the interests involved, will in a degree affect competition at the sale. But this is incident to the very nature of the business, and must give way to superior considerations, if such there be. From the facts developed in these affidavits, it is highly probable that some of these ferries, considered by themselves, are not very remunerative even at the present rates of fare; and yet that they are eminently conducive, if not absolutely indispensable to the public convenience and accommodation. I can well conceive, also, that they may possibly be better managed, with a view to the accommodation and safety of travelers and passengers, if under the direction of a single concern, with uniform rates of ferriage, than if attempts were made by rival interests in the

possession of the different ferries, to attract travel to their several localities by diminished rates of ferriage. It is quite possible that sufficiently remunerative returns for capital invested would be realized to the lessees, at a charge of one and a half cents, or even one cent for foot passengers—and this view of the case is strengthened by the fact which sufficiently appears, that competent and responsible persons are willing to take a lease of the ferries at that price. This circumstance is one which, if made apparent to the defendants, ought to have had, and ought to have great weight with them in fixing the maximum rate of ferriage which the lessees shall be permitted to charge. But can this court, in the exercise of its legitimate functions, control the action of the common council in that respect? This involves an inquiry into the extent and character of the rights of the defendants in the ferries in question, and how far, if at all, they are subject to judicial supervision and control.

I do not propose to enter into an extended enumeration or examination of the provisions of the Dongan, Cornbury or Montgomerie charters. I have examined them all, and have been presented by counsel, with a sufficiently copious abstract of them. A statement of them is also contained in the opinion of Mr. Justice Barculo, in the case of *Benson* v. *The Mayor &c. of New York*, (10 *Barb.* 223.) The validity of these charters is not denied by the counsel for the plaintiffs ; nor so far as they confer rights of property, if the defendants, as a municipal corporation, may lawfully take grants of property, is it claimed that these rights of property can be invaded. It is very properly conceded that rights of this character are inviolable, and they rest for their security not merely upon the constitutional provision that "no state shall pass any law impairing the obligation of contracts," but upon the immutable principles of justice and equity, which require the rights of private property to be respected, even when governments are overthrown. So far, therefore, as these charters confer rights of property, they are inviolable ; inaccessible to legisla-

tive or judicial interference, except in some of the forms well recognized by law. ·

I cannot assent to the proposition that a municipal corporation is incapable of taking real estate by grant, so as to have a right of property in the thing granted. I suppose, that under these charters the defendants have property rights in the *markets, the city hall, the lots of ground and public lands,* the *docks* and the *ferries* mentioned therein. They hold them as grantees, as owners, by contract, by a title equally strong and inviolable, I think, as do private individuals or corporations. They hold them, it is true, in trust for their constituents, and are answerable in a proper way to them for a breach of trust. But I know of no way in which their grantors, or the successors of their grantors, can lawfully invade these rights. They may hold them or certain of them, also, only for certain purposes, and in such case, the right of external interference with their administration of them depends upon the question whether those purposes have been violated or disregarded.

But, it is to be observed, that neither as regards municipal corporations nor private persons, is the right of property strictly absolute and intangible. Property is subject to be taken under the right of *eminent domain.* It is subject to *taxation* by the public authorities. And when it is in this way required for public purposes, the right of the property holder must yield to the paramount right of the public. Title to property is always held upon the *implied condition,* that it must be surrendered to the government, either in whole or in part, when the public necessities, evidenced according to the established forms of law, demand.

In regard to *ferries,* I am of opinion that there is a still further right, which the public may exercise, to wit : the right of *regulating the rates of ferriage,* and of so controlling ferry franchises and privileges in the hands of grantees or lessees, that they shall not be abused, to the serious detriment or inconvenience of the public. It seems to me that the

grantees of ferries, or ferry rights, must be deemed to accept them subject to these *implied conditions*. The people, represented by their king or their governor, as the case may be, own these rights, and hold them for the benefit of the mass of citizens of which the public is composed—and their representative, their king or their governor, must so administer them as that the rights of the public must be preserved. They cannot be conveyed away or surrendered. The navigable waters belong to the people, the sovereign power; they are for the use and navigation of the subjects or constituents of the government; and they cannot be transferred, even the usufructuary interest in them, so as to divest the government of that control over them, which is essential to protect and preserve the interests of the citizen. At least, I think the legal presumption is, that the grants of ferry rights are conferred and accepted with *such qualifications*. It is possible that a different question might arise if it was established that, as between the grantor and the grantee, a pecuniary or other valuable consideration was actually paid for the transfer or conveyance of a ferry right, not only present, but prospective. When such a state of facts presents itself, it will raise the question whether a government can for any consideration, or upon any pretense whatever, grant away or relieve itself from those rights and obligations which belong and are due to the constituent body, and are essential to their safety and well being. (*Town of East Hartford* v. *Hartford Bridge Company*, 10 *How. U. S. Rep.* 511. *Gozzler* v. *Corporation of Georgetown*, 6 *Wheaton*, 596. *West River Bridge* v. *Dix*, 6 *How. U. S. Rep.* 507. *Charles River Bridge* v. *Warren Bridge*, 11 *Pet. U. S. Rep.* 421. *Lansing* v. *Smith*, 4 *Wend.* 9. *Brick Presbyterian Church* v. *Mayor &c. of New York*, 5 *Cowen*, 538. *People* v. *Morris*, 13 *Wend.* 325.)

I am therefore of opinion that when these ferries or ferry rights (the distinction between which I shall presently consider) were conveyed to the mayor, recorder, aldermen and

commonalty of New York, by the colonial governors, Dongan, Cornbury and Montgomerie, they took the same subject to the governmental regulation and control, to which I have referred; that this right passed on the change of government from a colony to a state, to the supreme power in the state; and that it may be now manifested and exercised by the legislature acting for the people in their sovereign capacity.

It is in strong confirmation of these views that both the colonial and the state legislatures, notwithstanding those apparently unqualified grants, have repeatedly enacted laws regulating the rates of ferriage over these very waters, as well as over other tide waters, the right to establish ferries across which has been conferred by acts apparently unqualified in their terms. The statute books both of the colony and of the state are full of instances in which this right has been asserted, and I do not deem it necessary to cite them in detail. It is also worthy of observation that the Cornbury charter, (if not the others,) in granting leave to the corporation of New York to establish ferries for transportation, under such rates as had been usually paid, adds—"Or which at any time hereafter shall be by them established *by, and with the consent and approbation of our governor and council of our said province, for the time being.*" It seems to me, therefore, that notwithstanding the defendants should, under the sale which they have notified, convey to the purchaser a lease of these ferries, unqualified or silent as to the prices which should be charged, except the maximum rate specified in the notice, these rates would still be subject to legislative supervision and control, and that the lessees would take the same subject to such qualification. It may be said that the legislature, under pretense of regulating the right, might practically destroy it by reducing rates of ferriage to a non-remunerative standard. This is possible. Like all other powers of a similar character—like the taxing power—it is susceptible of abuse. It is not to be presumed that the legislature will do injustice. If

they prove recreant to their duty, the remedy consists in giving their places to others, and reforming the evil.

There is also another distinction of great importance to be observed—that is the distinction between a thing in *esse* and a thing not yet in existence—between a grant of actual property and a right to create property—between a conveyance of an existing ferry and a grant of a power to establish future ferries. The one conveys property, and with it, all the ordinary rights which attach to the ownership and possession of property; the other is a mere naked power not coupled with an interest, not conferring an interest. When the last of these charters, the Montgomerie charter, was granted in 1730, there was but a single ferry in existence—the *Fulton* ferry—and none was afterwards established till 1816, and then the *Catharine street* ferry. The *South ferry* followed in 1835—the *Hamilton avenue ferry* in 1846, and the Wall street ferry in 1853. Now, so far as the Fulton ferry is concerned, which existed prior to the date of the Dongan charter, in 1686, there was something upon which the charter could instantly operate, and carry with it valuable property rights—and so far as the other ferries are concerned, which were actually established before any legislative interference took place, the power was executed—the ferries were established under lawful authority, and, I think, carried with them equally valuable and inviolable property rights. This covers the case of the Catharine street and South ferries. But as to the Hamilton avenue and Wall street ferries, which were both established after the passage of the act of May 14, 1845, which placed the power of leasing or licensing ferries in the hands of commissioners appointed by the governor, the question is entirely different, and the question arises whether the government could not reclaim the powers; conferred, it is true, by the government of the colony upon the corporation of New York, but unexecuted at the time of the passage of the last named act.

This question brings into view the distinction between pow-

ers of a public nature and those of a private nature—a distinction now well understood and judicially recognized. The latter class of powers—powers coupled with an interest—powers conferring rights of property, as before stated, is incapable of recall. These powers, when practically exercised, are converted into property rights, and have all the incidents belonging to the rights of that character. But powers of the other class—public powers—are a mere delegation of political sovereignty, conferred upon the grantee as the mere agent of the sovereign, and liable to recall at the pleasure of the sovereign. Conferred for the purpose of the public good, and not of private emolument, it belongs to the sovereign to determimine whether they can be most faithfully and wisely executed by the sovereign or the agent, and that determination is manifested when the sovereign does any act inconsistent with the further exercise of the power by the agent or donee of the power.

This class of powers is vested in the government for the general good—is supposed to be delegated with no other object, and may be resumed at the pleasure of the sovereign. Accordingly, in reference to this very charter, this very power of legislative resumption or recall, has been repeatedly exercised, and particularly in reference to the rights of the corporation to appoint measurers of grain, and license innkeepers. Various other powers enumerated in the charter have been taken away or practically treated as under legislative control by the charter of 1857, and the judicial decisions are numerous which recognize the distinction here noticed, not only generally, but as applicable to the charter in question. · (*People* v. *Morris*, 13 *Wend.* 325. *Bailey* v. *Mayor &c. of New York*, 3 *Hill*, 539. *East Hartford* v. *Hartford Bridge Company*, 10 *How. U. S. Rep.* 534. *Brick Presbyterian Church* v. *Mayor &c. of New York*, 5 *Cowen*, 538. *Vanderbilt* v. *Adams*, 7 *id.* 349. *Lloyd* v. *Mayor &c. of New York*, 1 *Seld.* 374. *Wilson* v. *Mayor &c. of New York*, 1 *Denio*, 595.)

But while it appears to me that the regulation of the rates

of ferriage upon the ferries in question is within the control of the legislature, and so long as such rates are not regulated by them, they are the proper subject of regulation by the city government, or of contract between the defendants and their lessees, it is a very different question, whether, and to what extent, it ought to be interfered with by the courts. Am I in a condition to say that under the circumstances the provision fixing the maximum rate of ferriage for foot passengers at two cents, but not requiring the imposition of such a rate, is an abuse of corporate power? If the matter is so plain that it will amount to fraud or palpable oppression upon the citizens who shall have occasion to cross the ferry, then a court of equity should probably interfere. But I am not satisfied that such a conclusion would be well founded. It results then in this, ought a mere difference of opinion between the court and a municipal corporation, as to the proper rate of ferriage to be charged, to induce an interference by injunction—in a case, too, where the erroneous judgment of the defendants, if it exists, may be corrected by an appeal to the legislature.

This is probably the most important question in the case. It is very clear that such a power, if it exists in the courts, ought to be most cautiously exercised. The corporation of New York are by their charters, taken in connection with their subsequent action under the same, vested with the property of certain ferries, and with the right to establish others. Incident to that right, in the absence of legislative action, must be the right to establish rates of ferriage. The right would otherwise be valueless. These rates should of course be reasonable. Who is to decide that question? The legislature *may* do so, as I have endeavored to show. If they do so, the corporation are certainly justifiable for adopting their rates. If they do not, is not that very omission to act a tacit manifestation of the public will that it shall be left to the discretion of their grantees? The defendants are themselves a local legislature; and, I think, they have a right to legislate on this question. If there were no general law, why might

they not pass a local law fixing the rates of ferriage on the several waters about their city? But it may be said they have passed no law. Perhaps not in form, but have they not manifested their will, their intent, their judgment, in just as effective a way in the resolutions passed by them, fixing the maximum rates of ferriage? And is not this a matter submitted to their sound discretion in the absence of legislative action, fraud or palpable abuse? I think these questions must be answered in the affirmative. I need not cite authorities to the proposition that where a matter is left to the discretion of a subordinate tribunal, the exercise of that discretion in good faith, unattended with fraud or abuse on their own part, or imposed upon them by others, is absolutely conclusive. The remedy for their errors of judgment consists not in an appeal to the judicial power to overrule an authority confided to them by law, but in an appeal to the law-making power to overrule them by paramount legislation, or in an appeal to the people to eject from office the unwise and unfit incumbents thereof. I am, therefore, of opinion that, so far as this branch of the application is concerned, the injunction must be denied.

So far as the application is founded upon the allegation of a fraudulent combination between the common council of New York and the Union Ferry Company, to enable the latter to obtain the lease by imposing terms which cannot be complied with by others, I think it must fail for the want of sufficient evidence of the fact. The allegation in the complaint to that effect is not verified. It is accompanied by the affidavit of Alderman Dayton, of his belief of the fact, but that is too vague and indefinite to operate as the proper foundation of an injunction. Besides, it is repelled, so far as it can be, by the affidavit of Comptroller Haws. The facts relied upon as sufficient evidence from which to infer the fraud, are, in my judgment, inconclusive. The shortening of the leases, to take effect in the contingency of a sale, but not otherwise, is well enough accounted for by the supposed importance of selling

the ferries together for a uniform term, expiring at the same period; the refusal to adopt the proposition of the committee of the Brooklyn common council, and to listen to their suggestions, may have been an error of judgment, but does not, I think, justify the imputation of bad faith; and the conference, and to some extent concert, between the comptroller and some of the members of the common council and the chief manager of the Union Ferry Company was natural enough in a matter of so much importance; or at least does not seem to me sufficient to support the allegation of a fraudulent combination. Indeed, the agents of the corporation, in the whole matter are, as I have heretofore stated, not supposed to have acted with any disregard of the interests of their constituents, the citizens of New York; the charge, on the other hand, being of too anxious if not rapacious a wish to serve them. But even of this there is no sufficient evidence; as the rental of the ferries reserved to the city does not exceed the fair rental of the slips, piers, and ferry accommodations in the possession of the ferry company, if disposed of, for ordinary commercial purposes. As before stated, there is no sufficient evidence of fraud implicating the parties concerned in the negotiations and arrangements for the leasing and advertising of the ferries, from which to infer any corrupt bargain between them, to participate as individuals, in the profits of the transaction if ultimately consummated by a lease.

The only remaining question to be discussed is, as to the effect of the law of May 14, 1845, upon the powers of the corporation, and as to the validity and operative character of that law. Assuming that that law is now in force, I am of opinion, that so far as it applies to future ferries, established after its passage, it is a valid exercise of legislative power. By its terms I do not understand it as applicable to existing ferries. The power granted to the city of New York by the Montgomerie charter to establish future ferries, is a *mere power* conferred upon the city, and not a *right of property*. It is a public or governmental power, whose exercise is inci-

dent to and properly belongs to the sovereign authority. I doubt if the sovereign can alienate it beyond recall, inasmuch as the public welfare demands that it should reside in the legitimate representative of the whole people. If it be delegated or temporarily alienated, it may, I think, be resumed. So long as it remains unexecuted by the agent or delegate, it is revocable. It is not a grant of a property right, and so inviolable and indefeasible. But it is a delegation of authority for public purposes, and not for private emolument, and so the principal may retake it into his own hands. It confers no present rights of property ; it vests no title to real estate, and I think it must be deemed to be accepted with the implied understanding that it is subject to recall, so long as it is not carried into execution. Though on its face exclusive, it does not mean exclusive of the donor, but of any other donee.

It follows, from these considerations, that if the law of 1845 has not been repealed by the act of 1857, it is valid and operative as to the two ferries which were granted or established after its passage. To that extent the provisions of the cnarter have been overruled by subsequent and paramount legislation. If that law is in force, the corporation of New York has no authority to lease the Hamilton avenue and Wall street ferries ; and their attempt to do so, is a threatened exercise of illegal power, which, from its grave character and serious consequences, may be properly restrained by injunction. In arriving at this conclusion, I do not come in conflict with the decisions of Mr. Justice Barculo, in the case of *Benson* v. *The Mayor &c. of New York*, (10 *Barb*, 223,) for he abstained from deciding the question ; nor, necessarily, with that of Mr. Justice Roosevelt, in the unreported case of *The Mayor &c. of New York* v. *Benson*, who is said to have decided in favor of an injunction restraining the defendants in that case from taking possession of and running the Fulton, South, Hamilton avenue and Wall street ferries. The defendants in that case justified or defended, under a single lease of these four ferries combined, and the decision may have been placed upon

the ground that, as the defendants were attempting to assert rights as to the ferries under a lease or license, as to two of which, at least, it was invalid, they ought to be enjoined. It does not appear distinctly what the decision was, nor at all upon what grounds it was based, and I feel therefore at liberty to adopt my own conclusions.

But it appears to me that the act of 1845 was, by operation of law, repealed by the amended charter of 1857. These acts relate to the same subject matter, the ferries of New York, the former embracing the ferries to Long Island, the latter *all* the New York ferries, provide different and inconsistent modes of leasing or licensing the same, are both emanations of the same law-making power, and the *latest* expression of the legislative will must prevail. The act of 1845 contemplates a *licensing* of the ferries by *commissioners*, treating personally with the lessees, and not by a public sale, and an exercise of *discretion* on the part of the commissioners in the *selection* of the *licensees*, as well as in the *number* of ferries to be maintained ; and the *places* where they shall be established. The act of 1857 is designed, I think, to establish a uniform and homogeneous system, applicable to *all* the ferries, and provides for a sale or *leasing* of all the ferries at *public auction* by the *city author-ities* to the *highest bidder*. This is inconsistent with the exercise of the *discretion* and *judgment* of the commissioners required by the act of 1845. The machinery by which the results are accomplished is altogether different under these two systems, and I do not think they can stand together. By implication of law therefore, as well as by the express declaration of the 54th section of the act of 1857, which repeals all laws inconsistent therewith, (if it does not repeal large portions of the act of 1857 itself,) the act of 1845 must be deemed abrogated. It does not therefore stand in the way of the defendants.

The result is, that the motion for an injunction must be *denied*, and the temporary injunction heretofore issued must be *dissolved;* but as the question is of importance, and proper

for review, the dissolution of the temporary injunction is not to take effect until ten days after the defendants have notice of the order entered upon this decision.

[COLUMBIA SPECIAL TERM, January 9, 1860. *Hogeboom*, Justice.]