By the Court.—Monell, Ch. J.
The appellants claim th franchise in question under one or other, or both, of the following propositions.
First. That there is no exclusive right of ferriage in the plaintiffs ; but that as to any ferry not in being at the granting of its ancient charters, the right is common to all citizens ; or,
Second. That the lease and permission of the Department of Docks vested the right of ferriage in the defendants.
A brief examination of the several charters under which the plaintiffs claim the exclusive right of ferriage will suffice to establish such right.
Dongan’s charter (1686) was a general grant of liberties, privileges, franchises, rights, royalties, free customs, jurisdictions, and immunities, with a special confirmation of one ferry which had then been established.
The Cornbury charter (1808) granted to the mayor, &c., full and free leave, &c., to establish and maintain one or more ferry or ferries, as they shall from time to time see fit, between the city and the adjoining shore of Long Island.
But the Montgomerie charter (1780) was a grant (§ 15 Valentine's Laws, 227) and confirmation to the mayor, aldermen, and commonalty of the city of Hew York, and their successors forever, “ of the sole, full, and whole power and authority of setting, appointing, establishing, ordering, and directing . . . such and so many ferries around Manhattan Island, alias Hew York Island, for carrying and transporting people,” &c., from said island to any of the opposite shores, all around the same island, in such and so many places, as the common council should think fit, *240 granting to the said mayor, &c., all the rents, issues, profits, ferriages, fees, and other advantages arising and accruing from all such ferries.
And by the 3?th section of the same charter (p. 243) there is a further grant and confirmation of the ferries then established, and “ all other ferries now and hereafter to be erected and established all around the island,” with the fees, ferriages and perquisites of the same.
There is also (§40) a covenant to the mayor, &c., and their successors, of quiet and peaceable enjoyment of all the granted privileges, immunities, and franchises.
The plain and explicit language of those grants admits of no doubt that the mayor, &c., of New York became vested with all the rights which then resided in the crown in the several franchises granted; and it is equally clear that the grant was of all ferries then existing or thereafter to be established.
It is a question, however, whether the crown could grant to a municipality a right which, so far as it is a public right, belonged to the people.
The sovereign power was at the time of those charters, in the crown ; and as there was nothing in magna charta to qualify or restrict the power of the sovereign in respect to it, the grant was complete, and divested the people of any right which they could claim the enjoyment of. The sovereign will was paramount, unrestricted, irresponsible to the people, and the rights of the people were subservient to it.
That a different and much less power resides in the sovereignty of the state of a republic, affords no reason for confining or abridging the powers of the sovereignty of Great Britain. The former is limited by organic laws, in and by which, the people, having parted with only a portion of their own sovereignty, have thrown around themselves limitations and restrictions for their own security and protection.
*241 The provision of our state " constitution, that the people, in their right of sovereignty, are deemed to possess the original and ultimate property in and to all lands within the jurisdiction of the state (Art. 1, § 11) contains in words the principle which clothed the sovereignty of Great Britain with a similar right when the ancient charters were granted and which covered not only property in lands, but in all other things, corporeal and incorporeal, which did not belong directly to the people.
I do not think it necessary to further pursue the inquiry whether a ferry franchise could be the subject of an exclusive grant. It is too palpable, and has received sanction and assent too long, to be open to question now.
I do not intend by this to say that the city has acquired under her charters so exclusive a right to establish ferries that there can not be any interference with it by the legislature. That question will be briefly discussed further on. But I do mean, that until deprived of such exclusive right by some competent power, the city was granted the sole and exclusive use of the franchise of ferries, and was entitled to maintain or license them for its sole benefit and emolument.
These several ancient charters, and especially the charters of Dongan and Montgomerie, were recognized and adopted throughout the whole of the colonial government, and have been frequently ratified and confirmed by subsequent legislation. More especially the Montgomerie charter, which, as Chancellor Kent says (Kent's Notes on Charter, 212, N. 19), is the charter upon the foundation of which the city of Kew York is at present governed.
The long, frequent, and uninterrupted use of the franchise by the corporate authorities, their, until now, unquestioned right to the exclusive use and *242 enjoyment of it, with its perquisites and emoluments ; and the implied, if not actual, sanction of legislatures, the courts, and the people, establish a right, even independent of these charters, which should not lightly be set aside.
The sanction of the legislature is found in the enactment that the charters known as the Pongan and Montgomerie charters, so far as they are in force, shall continue and remain in full force, and shall not be construed as repealed, modified, or in any manner affected (Act 1853, chap. 217, § 54).
The courts have upheld the plaintiff’s claim to the franchise in the following cases : Benson v. The Mayor, 10 Barb. 223 ; The People v. The Mayor, &c., 32 Barb. 102; Milhau v. Sharp, 27 N. Y. R. 619.
The conclusion, therefore, must inevitably be, that the plaintiff owns the exclusive right of the ferry franchise in and about the island of New York, and that such right is not confined to ferries established at the time of the Montgomerie charter, but extends to and includes all other ferries which the corporation might thereafter establish from Manhattan or New York Island to any of the opposite shores. I am aware that Benson v. The Mayor, &c. (supra) does not determine this question in respect to future ferries, It was not necessary in that case that it should ; but for reasons which will be found in the discussion hereafter of the second proposition, the future as well as the present was covered by the charter, so that the right which Benson *. The Mayor held to be a vested right in the city, in respect to the established ferries; continued and attached to all that were at any time afterwards established.
It follows from this view of the law that any ferry operated and conducted from any part of the island to any opposite shore, without the license of the plaintiff, is unlawful.
*243 The second proposition is perhaps of more difficulty. Part of it involves considerations and questions of which the decisions are not uniform, and upon which a reasonable doubt attaches.
The defendant, The ¡North Shore Staten Island Perry Company, claim the franchise under a lease or license from the Department of Docks, one of the departments of the city government,—and the other defendants justify under the written permission of the same department.
Two questions arise under this proposition: The one involves the powers of the Department, and the other the competency of the legislature to grant the power if it exists.
The Department of Docks was constituted under the Act of 1871, which is amendatory of an act to re organize the local government of the city of ¡New York (Laws 1871, chap. 574).
Section 6 of the act defines the powers of the Department. The board is to be appointed by the mayor, and they were to possess such powers and perform such duties as should be established and defined by the commissioners of the sinking fund of the city. The Department is then given exclusive “ charge and control ... of all the wharf property belonging to the corporation . . . including all the wharfs, piers, bulkheads, and structures thereon, and waters adjacent thereto, and all the slips, basins, docks, water fronts, land under water and structures thereon, and the appurtenances, easements, uses, reversions, and rights belonging thereto, which are now owned or possessed by the said corporation.” Power is also given to lease any of the above mentioned property.
The Act of 1873 (chap. 335) continues the Department with its powers, and by section 26, it is made a department of the city government. The powers thus defined and expressly given are sufficiently compre *244 hensive, as was said in Hoeft v. Seaman (38 Sup'r Ct. R. 66), to extend over the dock property of the city, and over the slips, basins, and adjacent waters; and includes the power to grant leases of such property.
If, therefore, the lease to the North Shore Staten Island Ferry Company had been of the pier, slip, or basin for any commercial purpose, or for a purpose connected with the ordinary use of such structures or spaces, and not extending beyond such ordinary use, it would have been within the powers of the Dock Department, and not an invasion of any vested right of the corporation. Such a power over the described property may be said to be expressly given, although the use to which the lessee may put the premises is not defined or limited. But, as was held in Hoeft v. Seaman (supra), the power of the Department over waters adjacent to the piers or wharfs is subservient to the public use, and if given in excess of the public right to use such waters, it would be invalid.
It is a well settled principle in the construction of statutes that the authority it confers can not be stretched or extended beyond the intent; and where the language is clear, the letter of the statute will indicate the intent. This is especially so where conferred powers are named and described in the statute. In such a case no power can or will be implied, except, perhaps, such as may be necessary for the exercise of those expressly given. To that extent only will the statute be enlarged to let in incidental or implied powers.
The lease of the Dock Department to the North Shore Staten Island Ferry Company is of one of the piers and part of the bulkhead belonging to the city. Had that been the extent of the demise, it would probably have been within the competency of the Department to have made it It would have given the lessees the right to use the pier and bulkhead for any purpose *245 connected with the commercial use of such property and its adjacent waters, with the single limitation that it was not so far exclusive as to interfere with the public use of the navigable waters about it.
But the demise declares that the premises granted are to be used only for ferry purposes, and authority is given to the lessees or grantees ‘ ‘ to enter upon the said premises and take possession of the same . . for the purpose herein set forth.” If this was not in express terms a grant of a ferry, it was at least a license to the ferry company to use the pier and bulkhead in operating a ferry from the shores of the city to surrounding territory, which the company had done since the demise was made, without any other grant or license whatever.
Hot only is the ferry franchise not named among the objects over which the Bock Department is given control, but it is not even an incident or appurtenant to any of them. Such a franchise is property, having a distinct and separate entity, capable of being granted, demised, and enjoyed, and of being dissevered from other property; and it may exist without the coincidence of ownership of the riparian right.
Of course a landing-place at each terminus of a ferry is essential to its beneficial use; but the landing places and ferry franchise are so far separate property that the one may belong to the riparian owner, and the other to the sovereignty of the state, or a municipal corporation, or an individual.
This distinction of property is recognized in Doty v. Gorham (5 Pick. 487), and in Chambers v. Furey (1 Yeates’ Reports, 16), where it was held that the owner of a ferry over a navigable stream had no right to land or receive freight on the adjoining banks, even though the landing place was a public highway, without the owner’s consent. It was there said the dedication of ground for the purpose of a public road gave no right *246 to use it for the other purpose. This doctrine was after-wards recognized in Cooper v. Smith (9 Serg. & Rawle, 26). This, however, is probably not the rule in England, if the ferry landing is a public highway. It was so held in Petre v. Kendall (6 Barnw. & Cress, 703), where the King’s Bench said the owner of a ferry need not have the property in the soil on either side. It was sufficient that the landing place was a public highway.
The same distinction is preserved in our statute in relation to the regulation of ferries (1 R. S.-526), which requires the grant or license to be given to the owner of the land through which the highway adjoining a ferry shall run, unless upon notice he shall fail to apply for it.
It will be seen, therefore, that a ferry or a ferry franchise does not depend upon or require .a conjunction of ownership of the ferry and the land. A right of ferriage may, and frequently does, exist independently of the ownership of the adjoining land, and, as such is separate property, capable of a separate grant.
It is true that to ferry is a right properly appertaining to the soil, and attaches to the riparian proprietor, of which he can not be deprived except by the right of eminent domain.
But it has never been questioned, that the state, the sovereign power in which resides the original and ultimate property in all lands, could, in the exercise of its right of eminent domain, by making just compensation, condemn to the use of a public ferry the land of the riparian owner. The private grants or licenses of ferries made by the legislature under its right of eminent domain, are found in the statute book by the hundred, and the provisions of the Revised Statutes before referred to, for acquiring a landing-place, was enacted under the same right of eminent domain.
If, therefore, the several reasons which have been fur- *247 Dished, establish so complete a separation between the ownership of the riparian proprietor, and. the ownership of a ferry franchise, that they may be owned, and. possessed, as separate property, it must follow that the franchise is not a necessary incident or appurtenant to the land, and whatever may be the right or interest of the riparian owner—short, perhaps, of an exclusive and vested right—it may be made to yield to the power of the state in the exercise of its right of eminent domain.
Under this state of the law, the powers of the Dock Department over the pier and wharf property of the city may be exercised with out interfering with the other and separate property of the city, and leases may be made for the use of piers or wharfs and the adjacent waters within, and for the general commercial purpose of such property, without divesting the city of any of its right and title to any of its ferry franchises or other-property.
It is clear that there was no express power—and none can be implied—given to the Dock Department to license a ferry. Its functions were at an end when it leased the pier and bulkhead. It could not extend, directly nor indirectly, nor by implication, the use of the structure to a purpose that would interfere with the enjoyment of any public or private right.
The language used by the legislature, in prescribing the powers of the Dock Department might very easily have included a power to grant ferry licenses, and given it in express and unmistakable terms. That would have settléd the question of the intent of the legislature, and left only the question of the competency of that body to take from the corporation, as an entirety, its right over the franchise, and bestow it upon one of the arms or agencies of the city government.
But ferries are not mentioned in the statute; and it is not to be presumed that the legislature intended by any implication, or by any meaning which the law *248 may give to such words as “ appurtenances, easements, uses and rights belonging thereto,” to confer a power beyond that which is appurtenant to a dock or wharf, or an easement oy use connected therewith, of which a ferry is neither.
The intention of the legislature is also to be found in subjecting the Dock Department to some—and in respect to ferries, to a sufficient extent to the supervisory or directory power of the commissioners of the sinking fund (§§ 1, 2, Laws of 1871, ch. 738).
Prior to the act of 1871, the commissioners of the sinking fund had by statute and city ordinance (ch. 876, Laws of 1869, § 8; ch. 9, Revised Ordinances, § 28), charge of all the city property, including ferries ; and it must be presumed that it was in view of such custody or authority over the ferries, that the legislature guarded against the implication of any power over them in the Dock Department.
Having reached the conclusion that the legislature has not given to the Dock Department a power to grant a ferry license, it is not necessary to examine or discuss the question which was so largely discussed on the argument as to how far the legislature could or can divest the corporation of its exclusive right of ferriage.
hi or do I think the question is fairly, if at all, presented in this case.
Even assuming that the power claimed had been given to the Dock Department, it would not be a divesting of the corporation of any of its property, unless it can be claimed that such department was created without the consent or ratification of the city. But I think enough has been done by the city under the act constituting that Department- to show its consent to and acceptance of the act.
The Department of Docks is made a department of the city government. It is one of the agencies through *249 and by which the functions of that particular department of the city government are performed. And as all the functions of a municipal government must be performed through and by agencies, there can be no reason why the legislature may not create such agencies, especially if it is done with the consent and sanction of the city.
I am not prepared, except in those cases where rights are protected by constitutional provisions, to concur in the views expressed in Benson v. The Mayor (supra), that a municipality can possess a vested right in a property of this character, or that it can not be divested by the legislature. Certainly the force of that decision has been considerately examined and discussed in Darlington v. The Mayor, &c. (31 N. Y. R. 164), and in The People v. The Mayor (33 Barb. 102). Indeed, Benson v. The Mayor, &c., did not hold that the vested rights of the city in ferries extended beyond those already established ; and the learned judge said that the question of the right to establish new ferries by a legislative grant was not then before the court, and it was not passed upon.
But I do not propose to examine the question.
A remaining objection is, that the plaintiffs do not show such an injury resulting, or likely to result, to the city by the operating and continuing the ferry, as is required to be shown under section 319 of the Code. Such section is to the effect that it must appear by the complaint that the commission or continuance of the act sought to be restrained will produce injury to the plaintiff.
The allegation in the complaint is that the defendants, the New York and Staten Island Ferry Company, are conducting and running the ferry, and that the other defendants, the North Shore Staten Island Ferry Company, are unlawfully inciting and permitting such use of the property of the plaintiffs “ to the damage of *250 the plaintiffs in their rights and property.” And also that the former company is receiving and taking to their own use the “rents, issues, and profits, ferriages, fees, and other advantages arising and accruing from such ferry.”
These allegations are, perhaps, a little too general, but I think them sufficient as a pleading; and if they are not, may be amended so as to be made to conform to the facts.
The damage to the plaintiffs is the loss of the emolument it is entitled to receive from the ferry, either in ferry or license fees. As owner of the franchise, the ferry could, probably, be operated by the city, and the fees and income would go into the city treasury. Or it might grant a license, and receive the license fee. If, therefore, the city is deprived of either, or of any part, of this emolument by the unlawful usurpation of the franchise by the defendants, it would .be a sufficient injury to authorize the restraint.
It certainly is as full, both in the form and substance of the allegation, as in Fellows v. Heermans, cited in the opinion of the court in Erie Railway Co. v. Ramsey (45 N. Y. R. 645).
It is no sufficient answer to this, that the lease by the Department of Docks reserved a certain rent payable to the city. As the city repudiates the act of the Department, the rent reserved can not be taken tq satisfy the damages which the city may claim by reason of the unauthorized act of the defendants. Ñor is it an answer that as the city has not as yet established a ferry at or from the point occupied by the defendants, it can not sustain an injury by the usurpation of the defendants. It is enough that the defendants are using the city property, and depriving the latter of an emolument which it is entitled to receive, and which it would receive if the license had emanated from the city.
*251 My conclusion is, that the order appealed from should be affirmed, with costs and disbursements to be taxed.
Curtis, J., concurred.