Miller, P. J.
The money which the plaintiffs claim to recover in this action was realized under and by virtue of an act of the legislature of this State, entitled “An act to make further provision for the government of the county of New York,” passed on April 26, 1870 (1 Laws of 1870, ch. 382, p. 875).
By section 4 of said act it was provided, that “All liabilities against the county of New York, previous to the passage of this act, shall be audited by the mayor of the city of New York, the comptroller of the said city, and the then present president of the board of supervisors, and the amounts which are found to be due shall be provided for by the issue of revenue bonds of the county of New York, payable during the year 1871; and the board of supervisors shall include in the *39 ordinance levying the taxes for the year 1871 an amount sufficient to pay said bonds and the interest thereon, such claims shall be paid by the comptroller to the party or parties entitled to receive the same, upon the certificate of the officers named herein.”
It will be observed that the money raised by the issue of revenue bonds was to be paid by the comptroller to the parties entitled to receive the same upon the certificate of the officers designated.
Although the complaint alleges that the money obtained upon the bonds issued was deposited to the credit of an account kept by the chamberlain of the city of New York, as county treasurer of said county, there is no statute authorizing or requiring any such deposit, and therefore this allegation is immaterial to make out a cause of action, and this case must be considered as if the money remained in the possession and under the control of the officer named, for the purposes designated in the act, until otherwise lawfully disposed of.
The money claimed was in the hands of the comptroller, to be paid by him, as required by law, to the parties who had a lawful right to the same, and the bonds upon which the money was obtained were subsequently taken up in pursuance of chapter 323, entitled “An Act for the consolidation of the debt of the county of New York” (1 Laws of 1871, p. 631), and new bonds issued in the place of the old ones.
The injury complained of, and for which redress is sought in this action, is for issuing bonds for a larger amount than was required for the purposes named,— viz: the payment of liabilities against the county,— and the appropriation of the excess of money which was thus raised, by and for the benefit of the defendants.
There was no lawful authority to raise any amount of money beyond what was required for objects con *40 templated by the act of 1870, before cited. The amount which was realized, besides what was required for the payment of debts, was not for the benefit of the county or to pay its liabilities, or to be paid into the county treasury for any purpose whatever.
There is no law either for raising or appropriating any such fund, beyond the liabilities of the county, for if six millions, or any less sum, could be raised in this manner, then one hundred millions, or any other unlimited amount, might be thus obtained.
So far, then, as the money appropriated by the defendants is concerned, it was procured without any lawful authority, and in fact, in direct violation of law, as the act under which it was supposed to be obtained does not sanction any such proceeding. It was only legal debts, honest and bona fide liabilities against the county, which were to be audited and provided for by the issue of revenue bonds, and none but these demands would properly come within the provisions of the law.
The defendants then were in possession of funds' without any legal sanction whatever. As they were not obtained for the benefit of the county, nor lawfully paid to its proper officer, I am inclined to think that the county was not the owner, and never had lawful control over the money, and it never was within its lawful custody. While the county is liable to the innocent and bona fide holders of the bonds issued by its proper officers in due form, acting under color of authority, it by no means follows that the funds thus unlawfully obtained and which never had been lawfully paid over to the county or for its benefit, were the property of the county.
Even if it be conceded that the county in its corporate capacity can sue, as it was neither the owner nor in the lawful possession of this money, it could not *41 maintain an action of the character of the one now before us, for its recovery.
The tax-payers can maintain no such action, nor in any form demand redress, as has been adjudicated by the courts in numerous cases (Doolittle v. Supervisors of Broome Co., 18 N. Y., 155; Roosevelt v. Draper, 16 How. Pr., 137; 23 N. Y., 324. See, also, 12 Pet., 100). The future tax-payers who may be called upon to pay the bonds, who are at present unknown, and some of them not in existence, are the parties really interested ; and they cannot prosecute, for the reason that it is not known who they are or may be. Unless this action can be maintained, there is perhaps no remedy.
Assuming then, as I think we must, from the pleadings, that the money was unlawfully raised, and that it was unlawfully received and held by the defendant, the question arises, and is the main question to be decided in this case, whether the people can maintain this action ?
It is contended by the defendant’s counsel that the power of the attorney-general in England, as the representative of the crown, to correct abuses or misapplication of trust funds, by an information in equity, was confined to trusts for charitable uses; and that funds of municipal corporations which are not held for charitable purposes are not considered as trust funds, but are regarded as the property of the corporations, the same as estates of private individuals belong to them personally, and in such case, the only remedy, prior to the English act of 1835, for any misappropriation or embezzlement, was by an action or proceeding in the name of the corporation.
Assuming that the money in controversy was the property of the corporation of the city and county of New York, which, as already stated, is at least exceedingly questionable, it is a matter of serious inquiry how *42 far the English authorities sustain the doctrine contended for.
In the Attorney-General v. Brown (3 Swanst. Ch., 265), which was decided in 1818, an information in equity was filed by the attorney-general against commissioners appointed by an act of Parliament, being authorized to levy a rate not exceeding a certain amount, on the occupiers of all houses, &c., in Brighton, for paving, lighting, and watching the town, and another rate on coal landed upon the beach or otherwise brought into the town, for repairing or building works to protect the coast of Brighton against the encroachment of the sea, with power of distress for non-payment, &c.
It was alleged that the commissioners had improperly applied a large portion of the rate collected, and had distrained the goods of the relator for non-payment of the duty, and the information asked for an account and an injunction against an undue levy, and a direction that they replace any sums which they had applied to purposes not warranted by the act. A general demurrer for want of equity, and a defect of parties, was overruled.
The Lord Chancellor Eldon, at the close of the argument, remarked: “It is said that this is not a charitable use, and I am not disposed at present to consider it such;" and in an able and elaborate opinion, after a full discussion of the case, said, among other things, "I have heard nothing which prevents my concurring in the opinion that a parliamentary grant, destined to such purposes, is a gift to charitable uses. If that doctrine is contradicted, it must be done by higher authority than mine.”
Although it is claimed that this case was decided on the ground alone, that there was a charitable use, that such was not the fact appears quite distinctly from the case of Attorney-General v. Mayor, &c. of Dublin *43 (1 Bligh N. P. 312), which is hereinafter particularly referred to.
The next case in the order of time bearing upon the question, is the Attorney-General v. Willis (2 Simons & S., 67).
This case was decided in 1824, by the then Vice-Chancellor Sir John Leach, who had been counsel in the case of Attorney-General v. Brown. It was an information and bill in which ten persons were the relators and plaintiffs, on behalf of themselves and all the other tenants and occupiers of houses and other premises situate in Great Bolton, in the county of Lancaster, subject to the rates of assessments, and entitled to the benefit of certain acts of parliament, under which a common was enclosed and vested in commissioners, upon trust, to apply the rents for the improvement of the town, with power to them to levy a rate on the inhabitants in case the rents were insufficient. An account was asked of the rents, alleging misapplication, and that a rate levied was unnecessary. A general demurrer was interposed for want of equity, which was overruled, on the ground, among others, that funds supplied from the gift of the crown or of the legislature, or of private persons, for any legal, ;public or general purpose, are charitable funds, to be administered by courts of equity. The case of the Attorney-General v. Brown is referred to in the opinion of the Vice-Chancellor Sir John Leach, who had been counsel against the information in that case, and the views expressed appear to have been based somewhat upon an erroneous construction given by him to the authority in Attorney-General v. Brown, which case, as will be seen, sustains a different doctrine.
In Attorney-General v. Mayor, &c. of Dublin (1 Bligh N. P., 312), decided in 1827, an information and bill was filed in behalf of the inhabitants of Dublin paying water-rates, against the corporation, *44 stating various acts of mismanagement and misappropriation of funds arising from the rates, submitting that the corporation were trustees under the act for the rates thereby given, for uses which were charitable in their nature, and charging that the conduct of the corporation amounted to a breach of trust, and praying (among other things) for a declaration and execution of the trust, and that accounts might be taken of the rates received by the corporation and the application thereof, that the wrong-doers be decreed to replace the moneys they had wrongfully taken or misapplied, &c.
It was submitted in the answer, that the purposes specified in the act were not charitable uses, and held (reversing the judgment of the court below) that the court had jurisdiction to entertain the information and bill.
The decision of this case is not put upon the ground that it came within the statute in regard to charitable uses.
Lord Redesdale, who wrote the principal opinion, at page 341, says : “ It is expedient in such cases that there should be a remedy, and highly important that persons in the receipt of public money should know that they are liable to account, in a court of equity, as well upon the misapplication of, as for withholding the funds.” “ Suppose even the case of a public accountant, clearly within the act, who having embezzled or misemployed the public moneys, had rendered accounts which were imperfect or fabricated, could not the attorney-general, upon discovery of the fact, or the fraud, proceed by information to recover the moneys so fraudulently withheld or misappropriated?”
Again, he says: “A similar remedy is applicable, as I conceive, to any person having the trust and management of public money; any public accountant, of any description.”
*45 At page 347, he farther remarks : “We are referred to the statute of Elizabeth, with respect to charitable uses, as creating a new law upon the subject of charitable uses. The statute created only a new jurisdiction—it created no new law,” &c.......“In the process of time, indeed, it was found that the commission of charitable uses was not the best remedy, and that it was better to resort again to the proceedings, by way of information, in the name of the attorney-general. The right which the attorney-general has to file an information is a right of prerogative; the king, as parens patriæ, has a right, by his proper officer, to call upon the several courts of justice, according to their several jurisdictions, to see that right is done to his subjects, who are incompetent to take care of themselves, as in case of charities and other cases.”
The Lord Chancellor (Eldon), in the course of the argument, at page 334, observed that, “The case of Attorney-General v. Brown, whether ill or well decided, was not decided solely upon the ground that it was a charitable use. Upon reflection I thought so, but the judgment rested upon other grounds.” Again, he remarks: “In Attorney-General v. Brown the question was much argued whether the fund was to be applied to a charitable use. After the argument, it appeared to me that it was a charitable use. But that was not the ground of the judgment in that case, whether it was well or ill founded; because I was of opinion that the court of chancery had jurisdiction in that case, whether it was or was not a charitable use” He also remarks, at page 35, that the case of Attorney-General v. Heelis, weakens the authority of Attorney-General v. Brown, because much of the doctrine in the former case is not reconcilable with the principle of the decision in Attorney-General v. Brown. That in neither of those cases did the court look sufficiently into the old law upon the subject, and that the research which has been *46 made, rather confirms the decision in Attorney-General v. Brown. At page 357, he further states that, in Attorney-General v. Brown he “was of the opinion that it,was not necessary that it should be a charitable use, to give the court of chancery jurisdiction upon the subject.”
The case of Attorney-General v. Mayor, &c., of Dublin, is a strong and decided authority for the doctrine that jurisdiction exists, in all cases of public trust of the character indicated, in favor of the crown.
I think that the cases already referred to, as explained in 1 Bligh, must be regarded, up to that time, as holding that a charitable use is not essential to maintain the action to reach moneys misappropriated under the circumstances stated.
In 1835, the case of Attorney-General v. Mayor, &c., of Dublin, was followed and sustained by Attorney-General v. Mayor, &c., of Liverpool (1 Milne & C., 171), where it was held that the court had authority, under its general jurisdiction, to interfere for the protection of property vested in the corporation of a borough, upon the ground of a breach of trust committed or threatened.
The case from 1 Bligh is cited, and at page 201, the master of the rolls remarks, “ Nobody ever questioned the right of a court of equity to interpose, in order to see that the public duties were discharged, and that, the trusts upon which the corporation held the property were duly performed.”
The injunction issued was dissolved, because the construction of the statute was doubtful, and the injunction would deprive parties of the opportunity to exercise a right.
The information filed in the last case cited, was amended, and the same case is reported in 1 Keene, 513, under the title of Attorney-General v. Aspinwall, *47 where the demurrer was again allowed by the master of the rolls.
Upon an appeal to the high court of chancery, the decree of the master of the rolls was reversed (2 Mylne & C., 613).
It should be stated that the information in this case was filed for the purpose of setting aside a mortgage and an appropriation of moneys raised by the corporation of Liverpool, to endow certain clergymen officiating in that city, made by the old corporation before the election of officers under the new organization, and it was held that where property is devoted to trusts which are to arise at a future day, and to be exercised by trustees not yet in esse, an intermediate act done by the holders of such property, inconsistent with the security of the property or the performance of the trusts when they shall arise, will be set aside; and if the trusts are of a public nature, the court will entertain this jurisdiction upon an information of the attorney-general, notwithstanding that the trustees, after they come into esse themselves, decline to interfere. The lord chancellor said, page 623: “ I cannot doubt that a clear trust was created by this act for public, and therefore, in the legal sense of the term, charitable purposes, of all the property belonging to the corporation at the time of the passage of the act.”
The doctrine laid down in the case last cited, is in accordance with the decisions in the previous cases to which reference has been made, as explained in 1 Bligh. It may be remarked that the last case was subsequent to the English Reform Act of 1835 (5 and 6 W. IV., ch. 79), by which corporate funds were declared to be trust estates and funds of a public character, and the corporations or local officers becoming trustees for the benefit of the public, who became beneficiaries under the provisions of the act, and involved the construction of some portions of that act. This fact does not, however, *48 alter the law, as settled by previous cases, as to the right to maintain the action, even if there is not a trust in the nature of a charitable use, and does not impair the full and direct approval of the Lord Chancellor Eldon of the doctrine which had previously been enunciated. Since the passage of the act of 1835, the right of the attorney-general to bring actions of a similar character has been repeatedly adjudicated in the English courts (see Attorney-General ex rel. Mayor, &c. v. Wilson, 1 Craig & Phil., 1; Attorney-General v. Corporation of Poole, 2 Keene, 190; S. C., 4 Mylne & C., 17; also 8 Clarke & F., 409; Attorney-General v. Eastlake, 11 Hare, 205; The Same v. Bennett, 3 Irish Eq., 392; The Same v. Compton, 1 Youngs & C., 417). I do not consider it important to review these cases at length, and will only refer to one of them, which directly bears upon the question discussed.
Attorney-General v. Eastlake (supra), was an information filed at the relation of two of the rate-payers of Plymouth, against a majority of certain commissioners appointed under a local act, who were authorized to levy rates for paving, lighting, &c., the streets of a town, and it was held that as the object was beneficial, not only to the inhabitants subjected to the rates, but also to other persons having occasion to visit the town, the purpose was public and charitable within the meaning of the statute of charitable uses, and the question depends not on the source from which the funds were derived, but the purposes for which they were applied. In this case the earlier authorities are examined and discussed at length by the learned vicechancellor, who considered that the case of Heelis was overruled, and that of Brown sustained by 1 Bligh. He argues, at page 216, that “all the cases agree that not only the particular public or general purposes expressed in the statute of Elizabeth are charitable, but *49 that all other legal, public or general purposes are within the equity of the statute.”
After stating a case where an act of Parliament is passed for a private purpose, and for the benefit of individuals who are dealing with their own property, he remarks, at pages 222, &c.: “But when you come to the purpose of paving and lighting a town, which is for the benefit of all the inhabitants,” &c......“ one does not need to look at this recital, by which we are told that amongst other things, there will be benefited The Royal Naval Hospital, The Royal Barracks, and other public establishments. It is sufficient to say, it is a large and general purpose for this town, although not beyond the limits of the town, and for that purpose certain moneys are to be levied. I cannot see that the source from which these moneys are here derived, namely from taxation, can make any difference as to the charitable or public nature, and which would be attributable to the funds, if they proceeded from a more limited sphere of bounty; and if there be no distinction on that ground, the attorney-general is the proper person to represent those who are interested in that general and public or charitable purpose.” This case, then, virtually and really holds that all public uses are in legal effect charitable uses, and that funds raised for the general purposes of the public are within the rule. If rates raised for the paving of a town are within the rule, moneys realized under an act of the legislature, to pay debts incurred in the government of a great city, and in making public improvements for the benefit of its inhabitants and others who may have business there, are clearly embraced in the principle decided. The analogy is striking between the two cases, and I am unable to discover any real ground of distinction.
The case of Attorney-General v. Corporation of Caermarthen (Cooper Eq., 36), cited by defendant’s *50 counsel, is not in opposition to these views. In that case a demurrer was interposed for multifariousness, which was allowed, and the case was decided in 1805, long prior to the decisions before cited, which uphold the doctrine that an action may be maintained by the attorney-general, even if there is not a charitable use.
A careful review of the English cases establishes beyond controversy, that whenever an individual or a corporation have been authorized by a statute to administer public funds for public purposes such person or body is liable to an action by the attorney-general for any misappropriation or misconduct in the performance of the trust. I am not aware of any reason why the same principle should not control in this case.
The defendants’ counsel rely upon the case of People v. Miner (2 Lans., 396), as an authority in their behalf, which it is claimed, being a general term decision of this court, is decisive of the question. The action in that case was brought in the name of The People against the defendants, as said road commissioners, to restrain them from issuing certain bonds under an act of the legislature of this State for railroad purposes, and it was held that neither the Code confers upon the attorney-general the power to prosecute in the name of the people, nor has he such power at common law. The learned judge who wrote the opinion maintains the position, that the only cases in which, at common law, the attorney-general was authorized to interfere to restrain corporate action, or was a necessary party for that purpose, were those in which the act complained of would produce a public nuisance or tend to a breach of trust for charitable uses.
In this, I think he is entirely mistaken, so far at least as relates to municipal corporations, and he does *51 not sufficiently discriminate between public and private corporations, the difference between which should be borne in mind in the examination of a question of this character.
It is also apparent that he has entirely overlooked the case of Attorney-General v. Mayor of Dublin (1 Bligh N. P., 312), to which he refers, at page 407, and says: “ I have thus referred to all the cases cited in the opinion of Duer, J., except that in 2 Bligh N. P., 312, which I have not been able to find.”
The case is wrongly cited in 2 Duer, 668, as well as in 2 Lans., and hence was not at all considered by the learned judge. As this case thus omitted gives a construction to the prior decisions, and, as already shown, settles the law up to that period, its omission destroys the force of People v. Miner as a binding authority, even if it were applicable here. The fact that no effect is given to Attorney- General v. Mayor of Dublin, and the latter case not having been examined, discussed or considered, the last case cited is decisive of the quest'on now.
It may also be remarked that the opinion begins with a decision that the merits of the action were against the plaintiff, thus rendering it unnecessary to decide the question which was fully discussed, and therefore is obiter.
This case also holds substantially that a tax-payer is the proper party to bring such an action, which, if not erroneous, is at least doubtful, as the general term in the fourth department have recently held the other way. (See MS. opinion, Ayers v. Lawrence).
With all the respect which I entertain for the distinguished jurist who wrote the opinion referred to, and" with all the consideration which should generally be given to a general term decision, it would not be in accordance with well established rules, to hold that *52 this case under the circumstances was controlling and decisive.
In the case of Attorney-General v. Utica Ins. Co. (2 Johns. Ch., 371), also cited by defendants, the right of the attorney-general to maintain an action against a private corporation was considered, but that authority does not, I think, decide the question here involved.
It merely related to the jurisdiction of the court over offenses against a public statute, in regard to the business of banking, which arose on a motion made by the attorney-general upon an information filed by him. The remarks at page 384 were not necessary to the decision of the case, and the authorities cited mainly looked the other way. But, conceding that the opinion expressed is entitled to consideration, it is worthy of observation that the principle claimed to be upheld has been overruled in the English courts by numerous subsequent cases. This case was decided in 1817, while those which we have already cited as decisive of the law were all determined at a far later period.
The defendants also rely upon the language of Davis, J., in People v. Booth (32 N. Y., 398). This is not an analogous case, and the remarks there made were not called for in deciding the case, and therefore must considered as an obiter dictum.
It has been held that the attorney-general may prosecute on behalf of the State, or the State itself, where a preventive remedy is called for by the circumstances (Davis v. Mayor of N. Y., 14 N. Y., 526; The same v. The same, 2 Duer, 663; see, also, 11 Hare, 223).
In 2 Duer, 666, 667 and 668 (supra), the right of the attorney-general in the name of the people to maintain an action for a public wrong is fully and ably vindicated, and although the authority of the last case is questioned in People v. Miner, I am inclined to think *53 that the views expressed by Duer, J., can be upheld, as we have already seen, both upon principle and authority.
In People v. Mayor, &c. (32 Barb., 102), it was held by Hogeboom, J., at special term, that where there was a clear violation of law or a clear misuse or abuse of corporate powers, the people, as representing the general public, the body of citizens who are aggrieved, are the proper parties to.enforce the remedy.
In People v. Lowber (7 Abb. Pr., 158), Ingraham, J., intimates an opinion that, in such a case as was then before him, the attorney-general might maintain the action.
In People v. Mayor (9 Abb. Pr., 253), the same views are expressed by the same learned judge. In People v. Mayor (10 Abb. Pr., 144), T. R. Strong, J., holds the same doctrine.
Although the views of these distinguished judges are not entirely decisive, yet they are entitled to great consideration.
There are also several cases which have come to my knowledge, which are not reported, which are directly adverse to People v. Miner, and which involved the precise question which there arose; that is, whether the people could maintain an action restraining railroad commissioners from issuing bonds.
In People ex rel. Leonard Proctor v. Swarthout, which, I understand, was a similar action, Justice Mason, as referee, held that the action could be maintained, and in his opinion he says: “ This action is properly brought by the attorney-general in the name of the people on the relation of Proctor. The right to prosecute and maintain this action is given by statute,” &c. “ The attorney-general has the right to maintain this suit, independent of the statute, at common law,” and cites Story Eq. Pl., §§ 8 and 49; Mitford Eq. *54 Pl., 21, 24, 32; Barb., 102; Barb. on Parties, 367, Ed. on Parties in Eq., 6 and 61; Calvert on Parties, 301-308.
In People ex rel. Thompson v. Benedict, railroad commissioners and others, which was an action to declare void certain bonds alleged to have been unlawfully executed by said railroad commissioners, a demurrer was interposed to the complaint and sustained at special term. Upon an appeal at general term in the third judicial district, before Justices Hogeboom, Peckham and Ingalls, in March, 1870, Hogeboom, J., delivering the opinion, it was decided that the action was properly brought in the name of the people, and the demurrer overruled. The learned judge said, “I think under our statutes authorizing suits to be commenced by the attorney-general to restrain corporations from exercising unlawful powers, and individuals from exercising corporate rights and privileges not granted to them by any law of the'State, and under the well established powers of a court of equity, this suit is well brought in the name of the people.”
This case involved the same question as People v. Miner, and is similar in its leading features. The action could not be maintained without a decision of this very point in favor of the plaintiff; and as it is not apparent that any consideration bearing upon the question was overlooked, I am at a loss to see how it can be disregarded as a binding authority. It is at least entitled to as much weight as People v. Miner.
After a careful examination of the cases bearing upon the question considered, my conclusion is, that the action is properly brought by the attorney-general in the name of the people, and can be maintained in its present form.
Where a public right is infringed upon, the State, by the attorney-general, may bring an action for the *55 benefit of the people at large, or of a portion of the public. Such a rule cannot be confined merely to public nuisances. Many wrongs may exist without a remedy, except through the intervention of the State, and it seems to me that there is nothing inconsistent, with the principles upon which our government is founded and administered, to allow the chosen officer of the people in their own name to prosecute an action of this character, having in view the protection of the interests of the public against those acting as trustees on the behalf of a municipal corporation. There is no provision of the Revised Statutes or the Code inconsistent with such course of procedure; and I apprehend no danger can arise from the abuse of such a power, as it is always the subject of legislative restriction and regulation. This is the extent to which it is necessary to go to sustain the plaintiff’s action.
Nor is there, in my opinion, any substantial ground for claiming that the action cannot be maintained in equity, because a money judgment is demanded.
The Code has abolished the distinction between law and equity, and the equitable character of the claim is not less apparent, because the money was unlawfully raised and misappropriated.
That the recovery of money may be a part of the relief demanded in an equitable action, is also abundantly established by authority. This was a part of the relief demanded in Attorney-General v. Mayor of Dublin, and Lord Redesdale, in his opinion, as we have already seen, puts the question whether the attorney-general could not proceed by information " to recover the moneys so fraudulently withheld or misappropriated.” See, also, Attorney-General v. Compton (1 Young & Coll., 416, 426, 427).
If an accounting can be demanded in such a case, it seems quite clear that where no accounting is required, because the amount misappropriated is fixed and de *56 termined. that a recovery of the money in the hands of the parties may be demanded. If money could not be demanded in an action in equity, in cases of public trust, the equitable remedy would fail in many cases.
If the views expressed are correct, then it is not necessary to consider the question whether the board of supervisors or the county, even if there was a right in either of these bodies to sue, have authority to bring an action on behalf of the county.
In Attorney-General v. Wilson (1 Craig & P., 1), before cited, where the wrong-doers were officers of the borough of Leeds, the lord chancellor expressed an opinion, that although the attorney-general might assert the right of the public in an information, “if before the act passed, a corporation might, in a proper case, institute a suit, for the purpose of setting aside transactions fraudulent against it, though carried into . effect in the name of the corporation, that right cannot be affected by the attorney -general having also a power to complain of the transaction.” According to this intimation, there may, perhaps, be two rights of action which are not inconsistent.
It is not, however, necessary to determine this point, and is of no consequence, whether the county has the power to sue, if that right exists in the people.
It is quite enough that the action can be maintained, in its present form, in the name of the people, to uphold the complaint.
Nor is it, in my opinion, necessary that the county should be made a party in order to maintain this action, were they entitled to the money. In most of the cases cited, which related to the rights of municipal corporations, these municipalities were not made parties. Such was the fact in reference to Dublin, Brighton, Liverpool and Leeds.
The averment of collusion in the complaint was not essential, and this, as well as such portions of the com *57 plaint as set forth, facts not material to sustain the cause of action, upon the grounds already discussed, are redundant, irrelevant and immaterial. They furnish no ground for demurrer, and might have been stricken out, if a motion had been made at the proper time, or may now be disregarded as surplusage.
The question raised as to the disposition to be made of the money which may be realized if a recovery be had, is of no importance, if, as the authorities hold, the action can be maintained. It may, however, be assumed, I think, that the legislature of the State, in its wisdom, will make such provision for its appropriation as will be just and proper, and the circumstances of the case demand.
Some other questions are raised by the defendant’s, counsel, but these are not of sufficient importance to demand discussion.
The order appealed from must be affirmed, with costs, with leave to amend in twenty days after service of order, upon payment of costs.
The decision of the case of People v. Connolly depends mainly upon the questions already discussed, and as no additional points are presented, which authorize a reversal of the order in the latter case, it must, for the reasons stated, be affirmed, and the same order made in all respects.
Potter, J.
This case involves, in its determination, simply the question of the legal sufficiency of the plaintiff’s complaint as a pleading.
Eliminating all unnecessary verbiage of statement, the action is one simply brought against the defendants as trustees and public officers created by the legislature. It is brought to recover moneys in their hands, which, as it is alleged, they, by corrupt and fraudulent conduct, and by unlawful combination and conspiracy with others, have appropriated to their *58 private use ; for breach of trust; and for fraudulent omission of official duty. The cases have been thoroughly, elaborately and ably argued, both upon oral and printed briefs, and we have given to the examination of the questions a liberal share of time, and the exercise of our best judgment. The detail of facts set forth in the complaint, shows the appointment to office of the defendants, and the manner in which they obtained the moneys, and the manner by which, and the manner in which, the fraud and conspiracy, and breach of official duty was accomplished.
All these facts are admitted by the demurrer.
To these admitted facts, the defendants interpose four several defenses ; the first of which, I think, only, it will be necessary to examine at much length.
The second defense is, that the complaint does not state facts sufficient to constitute a cause of action. This, I think, has no merit. I do not stop to discuss it. A public officer has made a disposition of moneys in his hands, received for public purposes, in a manner unauthorized by law. In other words, he has been guilty of a breach of trust, in the misappropriation of such moneys. In such a case he ought to be made liable to somebody, for malversation in office. A good cause of action clearly exists upon the facts as set forth.
The third defense: “that it appears upon the face of the complaint that there is a defect of parties defendants, in the omission of the mayor, aldermen and commonalty of the city of Mew York,” is not, in my opinion, well taken. It neither appears in the complaint that the mayor, aldermen and commonalty of said' city, as a body corporate, participated in the alleged fraud, conspiracy, and breach of official duty, nor is it shown therein that such corporate body have any title to, or interest in, the moneys so raised, and so fraudulently obtained and converted. The legis *59 lature, in this act, conferred no title to the moneys which came to the defendants’ hands, upon such city corporation; they are not named in the act, and neither the source from which it was raised nor the agents by whom it was obtained were made subject to the corporate control of such city, or are liable to them for breach of duty.
The fourth defense: “that it appears upon the face of the complaint that there is a defect of parties defendants, in the omission of the board of supervisors of the county of Few York, ” is not, in my opinion, well taken.
The complaint shows no title to this purloined money in the board of supervisors.
They were not made the direct agent or instrumentality to raise it, to hold it in trust, to disburse it, or to render an account for it, or to call this special board to account to them, nor did the statute confer any title to it upon the board of supervisors. They were not made responsible for its honest appropriation, or required in any manner to intermeddle with it, or with any balance or surplus of it, remaining over; nor were they authorized, by suit or otherwise, to call the commission who were intrusted with it to account, or to prosecute for any fraudulent embezzlement, larceny or mismanagement of the fund so authorized to be raised, nor for any breach of trust or of official duty in regard to it. They were not made liable to pay the bonds. For does the fact, that they, the said board of supervisors, were made the subordinate instrumentality by the statute, under the taxing power of the government, to levy a tax, at a subsequent day, for the payment of the bonds so authorized to be issued, and upon which the money was raised, confer any title on them to the moneys so dishonestly obtained, and retained by individuals composing the special board of *60 trustees, or quasi, corporation, created by the legislature for that special purpose.
If it shall turn out that the State alone is authorized to bring this action against the wrong-doers, then this objection is immaterial; then the action is properly brought against this board of auditors for the abuse of their public trust, and against their co-conspirators. If the attorney-general is not authorized to bring the action, then this objection also becomes immaterial; the action must fail upon that ground. This brings the examination, really, to the only question in the case—the right of the people to bring the action.
The county of New York, previous to the passage of the act in question, like other counties, had a prescribed general system of government, and had also a regular organization and method of raising means for the discharge of its liabilities and the management of its financial interests.
This system was peculiar to itself—certainly somewhat variant from that of other counties, because of its different and peculiar condition, but it was a system intended to be suited to its own especial necessities. It was, nevertheless, its own particular but general system.
The act in question was in one particular a new and, as its title expresses it, a “ further provision for the government of the county.”
This new provision did not employ any established regular organization to that end, but created a new board with special powers to perform certain specific acts, which, when performed, of course exhausted the powers conferred upon this special commission.
In performing these specified acts, they were, by operation of law, constituted trustees of the moneys so to be raised. True, the organization called the board of supervisors were directed in the act to provide, by the usual method of taxation, the means to *61 pay the moneys for which this special commission should create a necessity; but the board of supervisors were thus but the subordinate agents of the special commission. It was in the pretended performance of the duties imposed by this special act, that this specially constituted board committed the acts charged in the complaint.
It will be seen that this auditing board, instead of personally performing that duty, by a resolution passed by them on May 5, 1870, delegated their trust, and resolved to take the certificate of their delegate as a substitution for their duty in this regard; in other words, refused to personally perform the duty.
The legislature, under the provision of section 2 of article X. of the Constitution, had power to create, and created, a new board of officers, and conferred upon them special powers authorizing them to perform certain acts and duties. This act was without any express provision for the accountability to the said board of supervisors, or to any other body.
The legislative power in this respect is sovereign.
The right of taxation is a power inherent in the government, and may be legitimately exercised in the way provided by this act, and it is not restrained by the constitutional provisions, that private property shall not be taken for public purposes without just compensation, nor from providing just such a system of taxation. Taxation is based upon the principle or theory that the tax-payer receives a corresponding benefit from the object for which the tax is raised, or on which the tax is to be expended.
In the case at bar, the statute assumes that there were liabilities existing against the county of New York, which it was the duty of toy-payers to meet; it appointed an independent commission, or special board of three individuals, who were required to audit such liabilities, and conferred upon them the power to *62 raise the means of payment thereof, by the issue of revenue bonds of the county of blew York, separate from every other known organized system to that end. It then provided a plan of taxation through the board of supervisors of said county, as one of the instrumentalities of this new system, to pay the said bonds. Ho moneys were obtained, or to be obtained, in any other method than from the sale of bonds ; and no more money could lawfully be raised than Just sufficient to pay the claims that were to be audited, though it was conceded on the argument that new bonds had been issued under the act of 1871, having a longer period to run, as a substitution for the bonds of 1870, upon which the moneys were raised ; the fraud alleged to have been committed was in the issue of the first bonds.
These provisions, together, completed a special system of taxation upon the tax-payers of the county of New York. It was, upon the face of the statute, for the legitimate purpose of relieving the tax-payers from a then existing liability of indebtedness.
The omission of the legislature to provide, in this enactment, a plan or provision by which to call the agents of this system to account, and guard against the abuse of power conferred, creates no right or title in any other known organized body of men, corporate, or quasi corporate, to sue for the abuse of trust, or for the moneys which have been so fraudulently raised and misappropriated by the members of the special commission. The statute conferred the power, without any accountability to the board of supervisors ; but surely, we cannot assume it to have been the intention of the legislature to place this body of commissioners, and the trust committed to them, above the power of the law to reach them ; or the trust committed to their care to be beyond its protection. We must not assume that the jurisprudence of the State is *63 so defective and inefficient; or that the legislature intended to permit these trustees to appropriate to their own use the money intrusted to their charge for other purposes.
This, doubtless, was an abuse, or omission, in legislation ; but I can find no more legal reason in this case for joining the board of supervisors as defendants, than for joining the board of police, or fire commissioners.
The board of supervisors was a mere instrumentality to carry out the behests of this special commission (People v. Flagg, 46 N. Y., 405).
It may not be denied that this money, in moral rights, and in equity and good conscience, should go into the treasury of the county of New York, and be applied to the extinguishment of the bonds so fraudulently issued and so unjustly imposed upon its taxpayers ; and in that moral sense, the county has an interest in obtaining the money to that end.
But before this court, is it the legal right of this county to be made such party, that is the question. It is the absence of any legal title, and legal interest conferred by statute law; it is the absence of all legal statute remedies by which they can obtain this money, and it is the act of collusion and conspiracy of the officers composing the organized authorities of the city and county that represents her legal interest, and which refuses to prosecute the offenders ; it is these causes which take from the county the power, as well as the disposition to prosecute, which present the legal question as to the necessity that the county should be represented as a party to this action ; and that the court are to consider. That it would have been most appropriate and wise for the legislature to have made a provision in the act rendering this special board liable to account to the board of supervisors is, and may well be, conceded, but it is not in the power of *64 this court to supply the defect. It is not within the legitimate sphere of judicial action to add what the legislature have omitted.
Judicial legislation is ever (as it should be) odious.
The legislature chose to create a special board without providing for their accountability to any one. Nor are we any the more called upon to travel beyond our sphere of duty, in order to answer the repeated interrogatory, “ To whom does this money belong ?” That question is not directly raised by the demurrer. It would be equally legitimate to inquire—Does it belong to the defendants ? and more appropriate to inquire—Does it belong to the board of supervisors ? Can they bring suit for it ? and, can the State bring this action ? But two questions really arise in the case in testing the quality of the pleadings, viz: 1. Is a cause of action set forth in the complaint ? and, 2. Is the plaintiff authorized to bring the action ? What shall become of the money when recovered, is not in issue. This inquiry is calculated to divert the mind from the only legitimate question in the case, viz: Is the pleading good ? It suffices upon this point, that we are unable to see, as is alleged, that the board of supervisors have a title to the money sued for which imperatively requires that they should be made parties defendants.
It is claimed by the defendant’s counsel, that the interest of the board of supervisors is shown in the fact, that the first deposit of the money raised upon the said bonds, having been made with the chamberlain of the city of New York, who, by virtue of his office, happens to be, and is, county treasurer, gave title to it to the county. To this it may be answered, this special board only, being responsible for the money, had power to deposit the proceeds of such bonds in any bank, or with other safe or convenient depository, and to draw it out again according to any plan or *65 system they chose to adopt. No person had a right to use or apply it, except upon the authority or order of this board, by their proper officer, to whom it was entrusted. If this special board or commission chose to "select any bank, or any city and county officer, or other instrumentality for convenience, for deposit or payment according to a prescribed form, such a selection by no means changed the title to the money. It was the comptroller only who was to raise the money, and he alone was to pay these claims, and they were to be paid by Mm, by moneys to be raised upon these bonds. He was the sole custodian of the money, not the county treasurer. This was a fund created by a special act; it was to be paid out only upon the official act of an audit by the board, of which he was one. It was to be applied to a specific public purpose, and was payable only by a designated public officer, appointed for that express purpose by the State.
This appointment made him a trustee of that fund. If he paid it into the county treasury in any other sense than as his depository, it. was so paid contrary to law, and no title thereto by that act was conferred upon the county.
If the act of the legislature did.not create or designate this fund to be one for which the board of supervisors was responsible, or confer upon them an interest in it, the act of the comptroller in selecting a city officer as a depository, did not work a change in the title to it.
So too, it is claimed, that the form given to the bonds issued by this special board, it being in the name of the county, and binding the county to its payment, and the form of its authentication being that the board of supervisors had caused the same to be signed by the comptroller, and countersigned by the mayor, and sealed with the common seal of the board, is all but conclusive, that moneys to be raised thereby, *66 were the moneys of the county, .for which moneys only the board of supervisors could bring an action. , The statute created the county liability to pay the bonds, but I am unable to see that this special board of trustees, by any action of theirs, or by the forms they employed to carry out the object of the statute, had power to change the title to those moneys, or, that the agencies or instrumentalities they employed in its management could have the claimed effect, even if that board had intended thereby to effect such a change. Equally immaterial is it, in determining this demurrer, to inquire what is to be done with the money when recovered ? It is not a question raised by the pleading.
If the board of supervisors have no legal title , to these moneys, it would be equally pertinent to inquire, what would they do with the money if recovered in their name ?
The injury complained of in this case, is not one that affects the corporate interest of the county of Mew York, or their corporate property. In contemplation of law, no money, arising from this source, was paid' into the county treasury : none was authorized to be paid in. Mo money for this purpose has been drawn from the county treasury.
It is an injury which does affect, and has affected, and in future will affect, the private interests of the future tax-payers of said county ; but the parties so injured, it is well conceded, have no remedy by action at law for the injury sustained (Doolittle v. Supervisors of Broome Co., 18 N. Y., 155).
They can neither individually nor jointly, nor in any corporate capacity, as present tax-payers, bring the action (Doolittle v. Supervisors of Broome Co., 18 N. Y., 159; Attorney-General v. Eastlake, 11 Hare, 225). Up to this period of time, no direct private interest has been invaded. I understand the rule to be this : when an offense against the public has been committed, *67 which includes a private injury, the private injury may be prosecuted for in the name of the injured individual ; but not so when the injury is not peculiar to himself, but affects a whole class of citizens alike. When the grievance consists in the illegal exercise of official public functions, it then requires that the action be prosecuted by the officer who has been appointed by law to sue in such cases.
The act of the legislature, upon its face, is a legal and valid act. It employed the instrumentality of a special board of officers, appointed by the sovereign power of legislation, to raise sufficient money, in a speckled manner, to discharge certain liabilities ; but it did not constitute any other body of men a forum or tribunal, to which they must account; nor did the legislature confer authority upon any other board, to vindicate the individual rights of the injured tax-payers, or give standing in court to anybody to sue for abuses of trusts. Assuming that the board of supervisors of the county of New York have corporate capacity, like other counties, their powers of suing, and of being sued, are both conferred and limited by statute. They can only sue and be sued in the manner prescribed by law (2 Rev. Stat., 364, marg. p., § 1), and no county, through their board of supervisors, shall possess or exercise any corporate powers, except such as are enumerated in the Revised Statutes, in the same chapter ; or such as shall be specially given by law (Id. § 2).
No power is found, conferred by law, which confers upon the board of supervisors the right to sue or be sued for such misconduct as is charged against the defendants in this action. Even the power to sue and be sued is limited. They are not liable to be sued for debts due from the county (Boyce v. Supervisors of Cayuga, 20 Barb., 295; Chase v. County of Saratoga, 33 Id., 607; Martin v. Supervisors of Greene, 29 N. Y., 647).
*68 If they cannot sue or be sued for this fraud, how can they be sued for the moneys obtained by it—how can they be necessary defendants?
I am not able to see in the fact that because the future tax-payers of the county of New York are made to pay liabilities through the form of taxation, by reason of the bonds issued by this special legislative commission, that the board of supervisors therefore become parties in interest in the moneys so obtained upon the bonds, and so fraudulently appropriated by the defendants.
Nor can I see, in the fact that the board of supervisors are made one of the instrumentalities of raising by taxation, in aid of this special commission, the means to pay such bonds, that they, as a corporation, have an interest in the moneys previously obtained and previously converted or stolen. They are made the subordinates, not the superiors, of this special commission.
The whole plan or system of raising the money in question was a new and special legislative scheme or device; the board created acted under the authority, if not by the command of the sovereign authority of the State. The authority was to issue bonds, raise money and pay liabilities, but it cannot be held that, because the taxation to meet the liability created for that purpose was to be effected through the instrumentality of the board of supervisors, or other officers named, that the latter had any interest in the fund so to be raised.
No objection is raised by the demurrer that the taxpayers of the county, who are to pay the bond-holders who advanced their money, are not made parties defendants, and we therefore take no time to discuss such propositions. We proceed, then, to the real point In the case.
The first objection raised by the demurrer I regard *69 as the main and real question, viz : “ That it appears upon the face of the complaint that the plaintiffs have not legal capacity to sue in this action.”
The action is brought by the people of the State of New York, by their attorney-general, as plaintiffs, against the defendants, for negligence of official duty and fraudulent misconduct, and, by a conspiracy, of fraudulently obtaining and receiving, and fraudulently appropriating the moneys raised by them as public officers, under the authority of a statute of the legislature of the State. The negligent omissions and the fraudulent breach of duty by which the acts were committed, are sufficiently stated in the complaint, and are sufficient to create a liability in favor of the proper party; and the demurrer, for the purpose of this review, admits the facts charged.
The simple question, then, is, can the attorney-general of this State bring and sustain this action in the name of the people of the State?
Has the State, in its character of protector, and as the natural and governmental defender of the whole people, and of each class and portion of them, a right to intervene by action to that end?
The counsel for the defendants meet this question, first, by citing section 111 of the Code of Procedure, which provides “ That every action must be prosecuted in the name of the real party in interest,” &c., and insist that the people of the State of New York have no interest therein.
It can hardly be claimed that this provision of the Code destroys the right of the State of New York to bring actions in behalf of the people in all that class of cases, in which at common law, that right then existed, nor that it extends to that class of actions, or to actions which cannot be brought under the practice established by the Code. Section 468 of the Code expressly provides that if a case shall arise in which an action for the *70 enforcement or protection of a right, or the redress or prevention of a wrong, cannot be had under that act, the practice heretofore in use may be adopted, so far as may be necessary to prevent a failure of justice. This would be just that case. But the right of the attorney-general to prosecute was neither conferred nor taken away by the Code. It does not abrogate his right, and is not repugnant to its exercise. In this particular, I concur with the opinion of the court, in People v. Miner, 2 Lans., 399, “That there is nothing in the Code which manifests the intention to take from the attorney-general any of his common law powers.”
Another of the answers to this position is, that it was a rule of the English common law, that the attorney-general is a necessary party, in all suits in which the crown is interested, and in this State, by our statute (1 Rev. Stat., 179), it is made the duty of the attorney-general to prosecute and defend all actions, in the event of which the people of this State shall be interested.
This places him, in our State, in the same relation to the government as does the common law in England.
The complaint alleges, and the demurrer admits, that the State, acting through its legislature, and upon the faith of the State, has authorized a special board or commission of officers, appointed by themselves, one of whom was authorized to issue certain bonds, and upon which bonds the credit of the county of New York is pledged that they shall be paid at maturity; that such bonds have been issued by such appointees and officers; that the proceeds have been stolen, appropriated or embezzled by a conspiracy of the said appointees or public officers, and certain co-conspirators; that the proceeds are traced to the hands of the defendants; that the county of New York, through the proper and legitimate authorities, has exhausted all means of taxation, by all the powers provided by law, to pay the said *71 bonds ; and that they cannot pay them ; that such bonds can only be paid by another exercise of the sovereign power of the State, through further measures of taxation; or by an action brought by the State, by their attorney-general, to recover such proceeds from the hands of the officers so appointed by the sovereign power; and, that this peculiar necessity and state of things imposes upon the State the political obligation and duty to exercise the right of the people, acting through their attorney-general, according to the laws of the land, to bring this action to demand and recover possession of the proceeds of the said bonds, now so unlawfully in the hands of the defendants; and this duty and necessity, it is claimed, show such an interest in the people, as authorizes the bringing the action in their name.
It is also alleged in the complaint, stands admitted, and is viewed as another necessity for bringing the action, that the defendants, acting in fraudulent collusion with the local authorities of said city and county of New York, to wit, with the mayor, aldermen, and commonalty of the city of New York, of which corporation the' defendant Connolly is a member, and with the board of supervisors of said county, of which body the defendant Tweed is a member, with the purpose to impede, embarrass and delay, and, if possible, to defeat any action in behalf of the people, and to enable the defendants to escape from the pursuit of justice, through the direction of the mayor of the city, Hall, he, the said mayor, directed the corporation counsel of the city of New York to commence six several actions against themselves in the supreme court—three in behalf of the mayor, aldermen and commonalty of the city of New York ; one against each of the defendants, Tweed, Connolly, and one against Hall, the mayor, solely, and three other actions in behalf of the board of supervisors of the county of New York—one against *72 each of said last named defendants, and Hall, solely. That the'said six actions were intended to embrace, in point of form and substance, claims for satisfaction of all the frauds of the defendant Tweed, official or otherwise, mentioned or referred to in the complaint in this action, and all other liabilities of the said Tweed, Connolly, and Mayor Hall, for which any action or recovery might be obtained against them or any of them ; but that the said six actions were commenced fraudulently, in bad faith, and will not and cannot be prosecuted fairly, beneficially, or usefully to the said people, or to any public interests, inasmuch as the said Hall (who directed the said actions) is governed by such evil designs and intent, and has complete control over the said counsel to the corporation. And they further allege that no other suit, action or proceeding can or will be had or taken by any other officer or authority of the said city or county, for the purpose of redressing the said frauds and wrongs against the people of the State of New York, and its authority, and the rights and property of its citizens, or of recovering the public moneys so fraudulently appropriated by the defendants. But, on the contrary, the said Hall, mayor, &c., and all other officers of said city and county, having any power or authority in the premises, intend and design to prevent any such action, suit or proceeding. or any redress or recovery.
This fraudulent combination and collusion of the defendants with the local authorities is alleged as a fact, and is urged as another reason why it became the duty of the people to institute this action in their name. This allegation must also be taken to be true.
Not less so here, than in England, is the act of a public body, whether corporate or incorporate, acting as trustees for the public interests which affect injuriously a whole community, a public wrong which the sovereign power is bound to redress. I think it may *73 be laid down as a legal proposition, that when a public right or interest is invaded, which requires vindication by judicial proceedings, and especially in cases in which, either no other remedy exists at common law, or when, by collusion, or by fraudulent design, the constituted authorities whose duty it may be to bring an action, refuse to prosecute, the attorney-general, representing the State in its sovereign capacity, may sue, and that whether the injury to the public interests affects the whole people, or any particular or limited organization of them. If this be not so, there may be wrongs without remedies. There is a class of cases in the English court of chancery, where it is found that the sovereign power intervenes to represent the injured parties, for the reason that they are prevented from coming into the court upon their own account; and no other legal party can be found to represent them (Attorney-General v. Compton, 1 Young & C., 416); but without such authority, I think the principle is elementary.
It would, I think, be a reproach, indeed, to our system of jurisprudence, to declare that it provided no remedy for such an atrocious wrong, as that complained of in this case, and as is admitted upon the record. Unless the statute cited by the defendants cuts off all remedy, I think our jurisprudence is not subject to that reproach. Can it be admitted that the sovereign power of this State is without the power, without a remedy, to protect itself and its citizens against the wrongs committed by its own agents, appointed to perform a public trust ? I think not. The only question then is, can that remedy be enforced by the plaintiff?
The anomalous character of the action, or the novelty of the particular complaint, in which the cause of action is set forth, is no objection to its maintenance, provided the injury set forth is cognizable by law; *74 shown to have been inflicted; and is one for which the people, as plaintiff, can bring the action. The statute, it is claimed, requires the real party in interest to bring the action.
Assume, then, that there must be a real party in interest. What is the character of that interest? And who is that real party? It is not the suffering taxpayers, as we have shown, who can be such party. No taxes have yet been paid on this account; it may be, that not one of the present tax-payers may be such when the tax shall be assessed, or when the bonds become due; and they cannot now allege that an injury is done to them.
If it were so, still it is settled that they could not maintain the action (Doolittle v. Supervisors of Broome Co., 18 N. Y., 155; Roosevelt v. Draper, 23 Id., 318, 323; 29 Id., 647; 33 Barb., 607). Our laws furnish them no relief.
The statute under color of which the fraud was committed, was a valid statute upon its face. No subsequent larceny of the money by these officers changes its validity. It is not the bond-holders, who have advanced their money in good faith under the provisions of a valid statute, that can bring the action. As yet they have hot suffered. Besides the faith and credit of the county of New York is legally pledged for the payment of the bonds.
They sustain no injury until the maturity of the bonds, and default in the payment of interest (18 Wend., 28, 77; 34 N. Y., 30). It is not the city corporation, as we have already shown.
It is not the body called the board of supervisors of the county, as we have also attempted to show. They have no such interest as entitles them to sue for the alleged fraud and breach of official duty of another independent board. It is not a fraud against that quasi corporate body. They are not made, by law, the *75 general guardians or protectors of the rights and interests of the people of the county, or clothed with authority to sue for injuries inflicted upon them; much less are they the guardians of that distinct and separate portion of the people called tax-payers of the county.
The grievance is not common to all the people; many of the inhabitants are not tax-payers, and there are, doubtless, many tax-payers who are not inhabitants of the county. That portion who are not taxpayers, are in no way interested in the question (Town of Guilford v. Cornell, 18 Barb., 639). Therefore, the importance of holding the board of supervisors strictly to the powers conferred upon them by statute, and to the power to sue and be sued only in cases so expressly authorized.
They possess no common law powers which authorize them to sue; and neither by common law or by statute are this board the representative of private interests.
See City of Georgetown v. Alexandria Canal Co., 12 Pet., 98, 99; 16 Ohio St., 320; 7 Ohio, 12; (Hammond), Cond., 366. The injury is not one affecting the corporate treasury of the county.
The injury consists in the fraudulent issue of bonds by the board of auditors to an excessive amount. Had they been issued for only the true amount, no injury would have occurred. The money raised thereon was not for the corporate treasury of the county. The board of supervisors had no right to exercise control over it, or over the officers authorized to raise it, or to apply to it county purposes. The excess of money, raised by the special board of anditors, certainly was not raised by authority of law, or for the benefit of the county; nor for certain creditors of it; and it cannot be shown that any power or authority exists at law by which the county or its board of supervisors became *76 possessed of a legal title thereto, for which they could bring an action upon the bonds, or for the moneys raised thereon; and I find nothing in the act of 1864, ch. 405, § 3, that applies to or changes the effect of the provisions of the act under which the alleged frauds were committed.
This act of 1864, upon its face, makes each taxpayer a cestui qui trust, equally, of the common council of the city, and of the board of supervisors of the county. But of what ? It also makes each of these organized bodies, equally, and makes the several members thereof, trustees of the tax-payers. But of what does it make them trustees ? “Of the property, funds, and effects of the said city and county, so far as such property, funds, and effects are or may be committed to their charge or control.” If this was a valid act, which is denied ; if it was in full force, and had application, which is also denied, it was still an act subject to be changed by the legislature ; and this is what was done. The legislature, by the act of 1870, took from these organized corporations and the members thereof, the trust so committed to them, and to their charge, and conferred the trust and committed all such property for a specified purpose, to a new commission, authorizing the latter to create liabilities upon the taxpayers. To this extent the act of 1870 dissolved the trust committed to the common council, and the board of supervisors so created by the act of 1864, and the act of 1870 omitted to make the tax-payers the cestui que trusts of this new commission, the board of auditors, or of any one of them. So that neither the board of supervisors of the county, nor the common council of the city, could be accountable as trustees for the acts of the board of auditors ; and therefore, they have no interests in those moneys as trustees, so as to entitle them to sue for them.
Nor do I think the Revised Statutes (vol. 2, p. 473, *77 marg. p., § 105 [92]) extends to this case. That section only gives authority to the board of supervisors to bring actions upon contracts made with them or their predecessors in their official character ; to enforce any liability or duty enjoined by law to such officers or the body they represent, and to recover damages to the property or right of such officers or the body they represent.
If I am in error in this construction, it will be shown hereafter that it does not affect the right of the attorneygeneral to bring this action.
This special commission, appointed by the legislature, whether or not they were a corporation, or a quasi corporation, it is not material to inquire. It is sufficient to say they were created by an act of the State, public officers, and they were invested with certain specified powers as such, to be exercised for special and limited purposes; but it was nevertheless clearly an office of public trust, to be executed for confessedly public purposes. They were not created the agents of the county of New York, or of the board of supervisors in their corporate capacity (Lorillard v. Town of Monroe, 11 N. Y. [1 Kern.], 395). The county could not be sued or made responsible for the manner in which they discharged or used the duties of their office, for their breach of duty, for misfeasance or nonfeasance, or for frauds, collusions, conspiracy or embezzlements of money. This special board of audit were not county officers (see Constitution, Art. 10, § 2). As the legislature possessed the power under this article and section of the Constitution to appoint these officers, they were as truly public officers when so appointed as the highest official functionaries in the State.
The legislature, under the constitution, had no power to appoint or make “ county officers.”
Nor had this board of auditors power, in the exer *78 cise of their functions, to act as “county officers” (Sheboygan Co. v. Parker, 3 Wall. U. S., 93), even though the exercise of their powers did relate immediately to the interests of the county. How, then, could any organized body of county officers call them to account?
Nor is it necessary to call them State officers because they were appointed by the State; it is sufficient that they were public officers—administrative officers. It was within the provision of the government of the State, by legislation, to pass acts to provide for the welfare of the whole community, and to secure the interests of all her citizens or of any portion of them, of any municipality within it. The power of the government over all the property within its limits for this purpose was never surrendered, and the government of the county of New York is only a part of the State organization to that end, subordinate to that of the State (People v. Flagg, 46 N. Y., 404-5).
The municipality of the county of New York cannot allege that the legislation in question was not for the public good.
The legislature is the conclusive and final judge of what the public interest and general good require to be done and of what is needed for any particular purpose. They devised this new machinery under the taxing power of the State, and they conferred upon their appointees important public functions. The right of the board of supervisors to exercise power over the property within her limits is only to the extent conferred by statute, and is subordinate to and subject to the supreme authority of the State, so far as the latter chooses to exercise her power by legislation within constitutional limits for the public interests (Ib.).
When the State has so exercised her power by legislation and by the selection of its own agents pr officers, unless such new officers are made accountable to the *79 local organizations of the county, the latter possesses no power over them (Town of Guilford v. Supervisors of Chenango, 13 N. Y. [3 Kern.], 149; Davidson v. Mayor of New York, 2 Robt., 244).
It is not because the acts of this new board, under provisions of this statute, lead to taxation of its citizens, that the money previously obtained by this board creates it the public money of the county.
If the trust had been faithfully executed by the officers, there would have been no money belonging to the county of New York, and it is not made plain that moneys obtained by breach of trust, and by the frauds, conspiracies and collusions of this special legislative board, enure to the benefit of a local organization, and thus authorizes them to sue or be sued. The means intended to be provided by this act of. the legislature, if honestly executed, were reasonably adapted to the purposes in view. It did not anticipate or authorize the possession of moneys beyond the actual needs to pay existing liabilities. These debts and liabilities are paid. All beyond that was obtained by fraud ; in fraud of the law; in fraud of the trust: and by fraud of these public officers against the future tax-payers.
The board of supervisors obtain no title to these moneys by reason of such a fraud; fraud does not confer title ; nor do its results enure to the benefit of this corporation. The board of supervisors had no control over the legal acts of this board of auditors. They have none over the moneys they secured by their illegal acts. This excess of money, beyond the necessities of the law, was not raised by authority of law, or for the benefit of the county of New York. The title to this money is no better than if it had been stolen. It is entirely unlike the cases of money raised by taxation through the regularly constituted authorities, under an illegal tax or assessment, and the proceeds paid into the county treasury, or expended for the uses of *80 the county (Newman v. Supervisors of Livingston Co., 45 N. Y., 676; Bank of Commonwealth v. Livingston Co., cited in Id., 682; People ex rel. Mygatt v. Supervisors of Chenango, 11 N. Y. [1 Kern.], 563).
The machinery under which this outrage was committed was created by State, not county authority. It becomes the State to assert, if it may, its vindicatory power of bringing the offenders to justice. In nearly every organized representative body, corporate or quasi corporate, who are intrusted with public funds, whose officers are annually or periodically elected, the body has continued existence, notwithstanding the change of its officers. In these cases provision is made by law for the incumbent of the office in his own name or name of office, or in the name of the municipality he represents, to bring actions for moneys in the hands of the predecessor in office ; but such action can only be brought by virtue of the statute authority. No such provision exists by statute in relation to this board of audit.
They have no succession. They exhaust all their own powers as a board, and die, and the statute has omitted the power to call them to account. In this it differs from the regular organizations.
But the defendants place themselves upon the ground that the State has no right to bring the action.
But if it be true, and because neither of the classes of citizens mentioned, nor either of the corporations or organized bodies named, nor any other officer, or person, by statute, can sue these wrong-doers, or call them to account for this official wickedness, the law still will not afford them impunity; and it is not to be held so weak or defective that no remedy whatever exists against the transgressors (Adsit v. Brady, 4 Hill, 632).
The old common law maxim, “ Ubi jus, ibi remedium” remains unimpaired. That there is no wrong without a remedy in the jurisprudence of New York, *81 is a doctrine I am prepared judicially to assert. This maxim was a part of the common law of England, it followed our ancestors here, and became a part of the colonial law. It was adopted into the State Constitution of 1777, section 35, and it has never been abrogated. Lord Coke says, ‘ ‘ The law will, that in every case where a man is wronged and endamaged, that he shall have a remedie” (Co. Litt., 197, b.
This maxim was regarded so valuable in English jurisprudence, that the judges invented a form of action purposely to carry it into effect, called an action on the case ; and for its further security, the Statute of Westminster, 2, in the 13th year of Edward I., chapter 24, was passed, to quicken the diligence of the clerks in chancery, whose duty it was to invent precedents in new cases, under some right requiring a remedy. This statute (13 Edward), gave direction to the clerks of chancery to agree in making such writs ; or the plaintiffs may adjourn it until the next parliament, by consent of men learned in the law: “A writ,” it says, “shall be made, lest it might happen after that, the court should long time fail to minister justice to complainants.”
From thenceforth, until the adoption of our State constitution, and ever since, this maxim, “that there is no wrong without a remedy,” has been the doctrine of the English and American system of jurisprudence.
Here, no less than in England, and in the other civilized nations of the earth, is it the duty, of the State, in its sovereign capacity, and as protector of its citizens against wrong, when no other method is appointed by law, to furnish a remedy.
Lord Hardwicke, the distinguished lord chancellor of England, in the case of The Charitable Corporation v. Sutton and others, 2 Atk., 406, said, “ The tribunals of this kingdom are wisely formed, both of courts of law and equity, and so are the tribunals of *82 most other nations; and for this reason there can be no injury but there must be a remedy, in all, or some of them, and therefore, I will never determine that frauds of this kind are out of the reach of the courts of law or equity; for an intolerable grievance would follow from such a determination,” . . . “ nor will I ever determine, that a court of equity cannot lay hold of every breach of trust, let the person be guilty of it either in a private or public capacity.”
Lord Redesdale, in the case of the Attorney-General v. City of Dublin (1 Bligh N.), said, “It is expedient in such cases that there should be a remedy, and highly important that persons in the receipt of public moneys should know that they are liable to account in a court of equity, as well for misapplication of, as for the withholding the funds.”
Then he supposes a case of one who, having some charge of such funds, embezzles or misapplies them, or who rendered imperfect or fabricated accounts of them, and said, “ Could not the attorney-general, upon discovery of the fraud, proceed by information to recover the moneys?"
In the case of Innes v. Lansing (7 Paige, 586), Chancellor Walworth said, “Whenever the legislature creates new rights in parties, for the protection and enforcement of which rights the common law affords no effectual remedy, and the statute itself does not prescribe the mode in which the rights are to be .protected, this court, in the exercise of its acknowledged jurisdiction, is bound to give a party the relief to which he is eguitably entitled under the statute.
Actions in the name of the people, by the attorney-general, against corporations for abuse of authority, are common in this State (People v. Mayor of New York, 9 Abb. Pr., 253; The same v. The same, 10 Id., 144; Attorney-General v. Cohoes Co., 6 Paige, 133, are instances).
*83 The role laid down in Attorney-General v. Compton (1 Young & C., 416), is this : “that where property is affected by a public trust, it is, in the hands of those who hold it, devoted to that trust, and that the crown is entitled by its officer to intervene for the purpose of asserting in behalf of the public, and the public interest, that public right which probably no individual can be found effectually to assert, even if the interest were such as to allow it.”
If this remedy, in behalf of the State, does not exist in this case, it may be safely asserted, that there is no body, officer, functionary, or person found, upon whom the right devolves. If this be so, then it appears to me, indeed, that it must be said the public are remediless against such wrongs; and it may then be proclaimed, that in the State of New York alone, that wise and ancient maxim of the common law, Ubi jus, ibi remedium, has been cast out of her jurisprudence.
But it does not follow, that because the State cannot be sued or made a defendant for the misfeasance of its agents, that it is not liable to its citizens for such a damage done to their interests; and the State may be' made a trustee for the citizens, in regard to such interests ; nor does it follow, that as trustee, it may not, as plaintiff, sue to recover such damage. In this case, under the exercise of the taxing power, it has authorized its agents to take private property of the citizens, and to the amount of the excess of property taken, it is done without making just compensation.
That the State cannot be sued does not relieve them from liability for the damages which they have illegally and unjustly inflicted upon the public. The State may prosecute, as plaintiff. The State, therefore, as we have said, owes a duty to the citizen to redress this injury and to discharge its liability so incurred. This creates not only an interest but also a duty to bring an *84 action (See Coster v. Mayor, &c. of Albany, 43 N. Y., 399).
The question returns, have the people of this State such an interest in this action, that they, by their attorney-general, may prosecute it?
We have no statute which defines or limits the powers of the attorney-general of the State, or which changes the common law.
We have various statutes, which impose new duties, and confer new powers upon him ; and there is one general provision, mating it his duty to prosecute and defend all actions, in the event of which the people of this State are interested.
His powers were well understood, as they existed at common law in England.
He was allowed to prosecute, without limitation, impediment, or delay, all offenses or matters that immediately affected the interest of the State; insulted the sovereign ; scandalized the credit; or endangered the security of the government (see 2 Wood Lect., 335); and he was the special representative of the crown in filing informations to correct abuses, or misapplication of trust funds held for charitable uses; and of municipal funds raised by local taxation, for local purposes; which were regarded as funds of the proper administration of which the ting, as “ parens patriae,” could demand an account, or remedy in a court of equity through his attorney-general. This was held, in the case of Attorney-General v. Brown (1 Swans. Ch.), opinion of Lord Chancellor Eldon, pp. 265, 300, 301, &c.
This common law was the law of our colonial government. The attorney-general under the colonial government, from 1684 to the year 1702, received, his appointment from the governor of the colony, and exercised his duties with no change of the common law. From the latter year until the revolution,.he was comm *85 issioned by the crown. He still possessed all these powers, under the colonial government, without change.
At the adoption of the first constitution of this State, in 1777, it was declared, " that such parts of the common law of England, and the statute law of England, and of Great Britain, and the acts of the legislature of the colony of New York, as did together form the law of the said colony on April 19, 1775, shall he, and continue, the law of this State, subject to such alterations and provisions, as the legislature of this State shall, from time to time, make concerning the same.”
While the legislature of this State have from time to time added new powers and duties to the office of attorney-general, I am not aware that they have ever abrogated or changed any of the powers of this officer that existed at common law in England and the colonies, in relation to such subjects as we have above referred to ; to wit, that of correcting abuses in the misapplication of trust funds for charitable uses, and which included municipal funds raised by local taxation; nor can I discover that such common law powers have become repugnant to the established laws and institutions of this State, so as to render them invalid.
The office of attorney-general, though an existing office, was not mentioned in the constitution of 1777, but in the constitution, a body of men, called “a council of appointment,” was created, and authorized to fill all offices not named in the constitution.
Sixteen different persons received appointment to the office of attorney-general from this power. Neither under subsequent constitutions, or acts of the legislature passed under them, has there been any change, limitation, or specification of the powers and duties of this office, except as to such new duties as have been from time to time created ; and in which, new powers were conferred for their due execution. His powers *86 and duties, therefore, in my opinion, are now in this State, such as have existed at common law from a period long before our existence as a colonial or State government; and such as have existed and been, or might have been, exercised at all times since, with the exception of such new powers and duties as have been added by statute.
Upon this point I entirely concur with what was said by the court, in the fourth department, in the case of the People v. Miner, 2 Lans., 399, viz: “As the powers of the attorney-general were not conferred by statute, a grant by statute of the same, or other powers, would not operate to deprive him of those belonging to the office at common law, unless the statute, either expressly, or by reasonable intendment, forbade the exercise of powers not thus expressly conferred. He must be held, therefore, to have all the powers belonging to the office at common law, and such additional powers as the legislature has seen fit to confer upon him.”
So, too, it was held, by Hogeboom, J., in People v. Mayor of New York, 32 Barb., 102, as follows: “Where there is a clear violation of law, or a clear misuse or abuse of its corporate powers on the part of municipal corporations, the people, as representing the general public—the body of citizens who are aggrieved —are the proper parties to enforce such remedy. I am referred to three manuscript unreported decisions to the same effect, in the following cases: People ex rel. Peck v. Gardner, Morse and others, arising in the sixth judicial district, in which the opinion was written by Parker, J. ; another in the same district, in the case of People ex rel. Proctor v. Swartout, opinion by Mason, J. ; and another case, arising in the third judicial district, in the case of People ex rel. Thompson v. Benedict; this was at general term, held by Peck *87 ham, Hogeboom and Miller, JJ. ; Hogeboom writing the opinion.
The rule is the same in the English courts. In the case of the Attorney-General v. Birmingham & Oxford Railway Co., the lord chancellor said: “I have attended to all the cases that have been cited, and they all fall within well recognized principles, that where acts are being done injurious to the public interests, inasmuch as the public interests might otherwise altogether be neglected, the attorney-general was, in such case, the authority to represent the public (8 Eng. Law & Eq., 243).
From what I have said, I think the following conclusions may be adopted from the case, as it is presented upon the pleadings to us :
1. That the case shows an existing cause of action against the defendants.
3. That under our system of jurisprudence, a remedy exists for this cause of action.
3. That the mayor, aldermen and commonalty of the city of New York have no such interest in the action as requires that they should be made defendants therein.
4. That the board of supervisors of the county of New York have no such interest in the action as requires that they should be made defendants therein.
5. That, by the law of the land, the people of the State of New York have such an interest in the action as entitles them to prosecute the same.
First.—It is the duty of the people of the State to bring the action.
Taxation and the liability to taxation, through which the citizen contributes, or becomes liable to contribute his property to demands of the State, through the sovereign power of legislation for the public interests, is the price he pays for governmental protection, and for the safe enjoyment of the remainder of his estate.
*88 For this consideration, the State, as the sovereign, owes a duty to the citizen, to afford him a protection against, injury and loss. These duties are correspondingly reciprocal. The duty of protection includes that of providing a remedy for injuries to person, life, liberty and property.
In this case, it is seen that the State, through its sovereign power of legislation, and the appointment to office thereby of a commission of its own, has by the action of such commission, created a pecuniary liability upon a portion of its citizens, to an amount exceeding six millions of dollars. The commission so appointed, have, by fraud, by combination and conspiracy, and under color of such legislation, created a liability upon such citizens, to an amount greatly exceeding the liabilities to be met, or the public necessities; that such liabilities were created by the said State commission, by the issue and sale of bonds, for the amount of which the citizen remains liable to taxation ; and the defendants, as such commission and officers, by such combination and conspiracy with others, and by fraud, and a breach of trust, have appropriated to their own use, and retain in their own hands, a large amount of the moneys so obtained, which, in good conscience and equity, should be recovered by action, and applied to relieve the citizens from a portion of their said liability.
In my opinion, it. is not only the ditty which the State owes to the injured citizen, but that it is the right, and within the authority of the people, to exercise the right; and by their constituted attorney to bring the action to recover the moneys so fraudulently obtained and held ; and I hold, that this duty, coupled with the right, and with authority to sue, is such an interest in the action, as is acknowledged by the law of the land ; and such as relieves it from all objection on this ground, if such ground could be urged ; which I think cannot.
*89 I think it is not necessary, in such a case, in an action for a breach of trust, to show that the State, as a corporate body, have the title to, or a corporate interest in the moneys sued for, to entitle them to bring the action. That is not the basis of their right or duty to prosecute. That is not the ground upon which the State assumes to stand. The right to bring this action, if it exists at all, is the well established rule of right and duty, by the common law ; the duty of protection of public interests against public agents invested with trusts.
This liability of public agents may arise as well from acts of omission as of commission.
It was said by Lord Hardwicke, in Charitable Corporation v. Sutton, 2 Atk., 405: “If some are guilty of gross non-attendance, and leave the management entirely to others, they may be guilty by this means, of the breaches of trust that are committed by others.”
If then, it be true, that the responsible personal public duty, imposed by law upon this board of auditors, was intrusted by them to others, who committed the alleged frauds as is manifest from their resolution of May 5, 1870), this was a gross breach of trust. It appears by this resolution that they not only did not audit the accounts, as was their duty, but that they thereby agreed they would not audit them. That is, the law required of them the personal performance of a duty; they refused to perform it.
Through their refusal, immense frauds followed, to the injury of the public interests.
Lord Habdwicke, in the same case, farther said, “By accepting of a trust of this sort, a person is obliged to execute it with fidelity and with reasonable diligence ; and it is no excuse to say, they had no benefit from it;” so, he said, “it had been objected, that the court could make no decree upon several persons, *90 that would he just; for every man’s non-attendance or omission of his duty, is his own default, and that each particular person must bear such proportion as is suitable to the loss arising from his particular neglect, which would make it a power out of the court.”
He answers this objection by saying, “ if, upon inquiry, it appear to be a supine negligence in all of them, by which gross complicated loss happens, I will never determine that they are not guilty.”
A trustee may be guilty of a breach of trust, from error or ignorance of his duty as well as by fraud and willful omission (Attorney-General v. Poole, 4 Mylne & C., 28, 29).
This trust was & personal tryst to the individuals to whom it was confided. It was their duty, personally, to perform it.
It was a violation of duty to delegate it, and the trustees became responsible for the abuses of their delegated agents.
I do not propose to discuss at length the questions of the reciprocal duties and obligations that exist under government, between the government and the citizen, as to the right of support from the one and of protection from the other. I shall assume that among the duties the government owes to the citizen, is that of furnishing a remedy, civil as well as criminal, to protect Mm from wrongs inflicted upon him, as well as to punish the wrong-doer. This has been regarded as a duty by every civilized government.
Puffendorf, whose authority on this subject was adopted as part of the English common law, says, " Since the subjects are obliged to the bearing of taxes and the like burdens, on no other account but as they are necessary to defray the public expenses, &c., it is the duty of sovereigns, in this respect, to draw no further supplies than either the mere necessity or the signal benefit and interest of the State shall require ; *91 and then they are to see that these impositions be levied according to the justest proportion, and that no immunities or exemptions be granted to certain persons, to the defrauding or oppression of the rest ” (Book 7, M. 9, § 10). And he holds it to be the farther duty of the sovereign to see that the way of gathering taxes be with as little charge as possible, “ and that much do not stick to the collector's fingers” (Ib.). And further, that every subject may be able to recover his right by as short and cheap a process as can be contrived (Id., § 5). It is idle to talk about governmental protection to the citizen if the earnings of his industry be appropriated and his property be taken by the action of government, and by governmental agents acting under the sovereign power, enforcing, upon the one hand, the duty which the citizen owes to his government of support, without the exercise of the corresponding duty, and the enforcing of the reciprocal obligation by the government, on the other, in return—that of furnishing protection and a remedy to redress the citizens’ wrongs.
Life, liberty and property are reckoned among the most valuable blessings of the citizen. He has no security of protection for the enjoyment of these, against encroachments made by the cunning of the strong and the combinations of the wicked, but that of protection from the laws and institutions of government, which shall be wisely administered by tribunals of justice furnished by the government, composed of men who shall be above fear and beyond reproach. What could be a greater inconvenience to the due administration of justice, or of reproach to a government, than the failure of justice from an acknowledged want of a remedy % There must, of necessity, not only be a remedy, but a jurisdiction adequate to deal with such cases.
It is, then, the duty of government to furnish the remedy for such a wrong ; and the duty of the courts *92 so to apply it, as to protect the weak and defenseless against the strong, and to punish the insolence of governmental agents who shall be found guilty of such shameless encroachments and wanton injury as the case presents; without this protection to the citizen, government, to him, would be but a mockery and a shadow.
Assuming then, that it is the duty of the State to bring an action, and that they have sufficient interest to sustain it, it remains to be seen whether they have the right to bring this action in their name by their attorney-general.
The English case of Attorney-General v. Brown, (supra), was, in its features, like the case at bar. It was an information by the State, to recover money, in the hands of commissioners appointed by an act of parliament, which money was the produce of an unauthorized assessment made upon the citizens of Brighton, one of the English towns, for the purpose of being applied to prevent encroachments of the sea. The commissioners abused the trust; made exorbitant and fraudulent assessments; appropriated the funds to their personal use; and when sued, demurred to the information.
That case, like the case before us, not only charged the unduly levying of taxes, but also, the misapplication of the funds when raised.
The defendants in that case claimed that the attorney-general was limited to bring such an action in cases relating only to charitable uses; such as are specified in the act of 43 Elizabeth ; and that this was merely a trust for a municipality, and did not come within that class of charitable uses.
Lord Chancellor Eldon, however, on a deliberate examination of the case, overruled the demurrer, and held the action well brought, and, as the report states, *93 that it was a charitable use, and held the defendants liable. This was in 1818.
Sir John Leach, who was in that case counsel for the defendants, endeavored to show that because the fund raised was by taxation, and was to be applied to the benefit of a municipality, it could not be a charitable use, and that it did not come within the statute of Elizabeth, but his argument was overruled by the lord chancellor.
Afterwards, in the year 1824, when Sir John Leach had become vice-chancellor, and the case of Attorney-General v. Heelis (2 Simmons & S., 77), came before him as vice chancellor, he held, in direct conflict with the opinion of the lord chancellor in Attorney-General v. Brown (supra), and in accordance with his own argument in the former case as counsel, viz: that it was the source from whence the funds are derived, and not the purpose to which they are dedicated, which constitutes the use charitable; and that when the funds were derived from rates or assessments to be levied upon the inhabtamts of a town, such was not a charitable use, though he admitted that the commissioners appointed by an act of parliament in such a case were trustees.
Sir John Leach, though ever regarded as a learned and able equity judge, could hardly entitle himself to the character of a modest one, when, in his opinion as vice chancellor, he attempted to overrule the earlier decision of the lord chancellor in the case of the Attorney-General v. Brown; and, as will be seen, the case of Attorney-General v. Heelis is not now, and has not since been regarded as authority in England. In a later case of the Attorney-General v. Corporation of Dublin, it was first decided in chancery, according to and upon the authority of the case of the Attorney-General v. Heelis.
But the case was appealed to the House of Lords, *94 where it and. the case of the Attorney-General v. Heelis were reviewed, and where the former was reversed, and the latter overruled—Lord Chancellor Eldon and Lord Redesdale delivering the opinions in the House of Lords (1 Bligh N. S., 312); Lord Eldon saying, “ That the mode in which the rate was levied was not to be looked at, but the purpose to which it was to be applied ; ” and Lord Redesdale concurring, also said, ‘ ‘ When the king, as parens patriae, may institute a suit by the attorney-general, it is not essential that the relators should join in the suit.”
In a still later case of Attorney-Greneral v. Eastlake (11 Hare, 205, &c.), a review of all the cases on this point was made by Sir William Page Wood, vice chancellor, and the cases of Attorney-General v. Brown and The same v. Corporation of Dublin were again considered and affirmed, and the case of the Attorney-Greneral v. Heelis again overruled. The case of Attorney-Greneral v. Eastlake is also directly in point.
It was a case of commissioners appointed by an act of parliament; the moneys were obtained by taxation upon the municipality ; the object for which the money was to be raised and to which it was to be applied, was directed by statute, and the bill charged the misapplication of the funds. The vice chancellor began his opinion by saying, “The case was entirely concluded by authority as to the right of the attorney-general to interpose ; ” and, after holding that the doctrine of Sir John Leach, and the distinction he attempted to draw between gifts and moneys raised by taxation did not exist,—in determining whether there was a charitable use in that case, he concludes, “I cannot see that the source from which those moneys are here derived, viz : from taxation, can make any difference as to the charitable or public nature, and which would be attributable to the funds if they proceeded from a more limited sphere of bounty ; and if there be no distinc *95 tion on that ground, the attorney-general is the person to represent those who are interested in that general and public, or charitable use”
Confirmatory of this view, is what is said in Attorney-General v. Mayor of Liverpool (1 Mylne & C., 201), which was an action brought against a municipal corporation, in which the question, among others, was raised, whether the attorney-general could bring such an action, and whether the court of chancery had jurisdiction to interfere with municipal corporations,
The master of the rolls held the affirmative of both propositions, and said : “But though a body having a corporate existence is capable of acquiring and possessing property, and therefore, also, of disposing of it; if property is held by a corporation as trustee ; if the corporation holds it, clothed with public duties, the court has always asserted its right to interfere ; ” and. he cites the case of Attorney-General v. Dublin, as authority for his decision.
In the case of Attorney-General v. Aspinwall (2 Mylne & C., 617), the Lord Chancellor, Cottenham, said : “ If the property in question be subject to any trust, and if the appropriation complained of be not consistent with such trust, but applied to purposes foreign to it; and, if there be not a provision in the act, taking from the court of chancery jurisdiction in such cases, then it will follow that the attorney-general has the right to file the information, and to pray that the fund may be recalled, secured, and applied for the public ; or, in other words, the charitable purposes to which it is devoted.”
Nor is it an objection, in the English court of chancery, that other parties are also interested, and may also bring an action for the injury ; that the attorney-general brings an action ; nor, that he joins with him such other interested parties ; so held, in the case of *96 Attorney-General ex rel. Mayor of Leeds v. Mayor, Aldermen, &c., of Leeds (1 Craig & P., 1).
Nor by the recent cases, is it necessary, in order to confer jurisdiction upon a court of equity, that the trust should be what is technically called a charitable use ; it is sufficient if there be a special, or public trust for public purposes, and a breach. It did'not in England, as was argued, depend upon the Statute of William IV., called “The Municipal Reform Act,” passed in 1835. It existed, and was so declared, long before that. See Attorney-General v. City of Dublin; Same v. Brown, supra. Nor does it affect the right of the attorney-general to bring the action in such a case, that a corporation or a private individual may also bring an action (Attorney-General v. Wilson, 1 Craig & P., supra). The question as to the right of the attorney-general to bring the action in this class of cases, has ceased to be discussed in England.
But one case is found in this State which is cited against this array of authority to show the converse of the rule of the right and duty of the attorney-general to bring the action before us.
It is a recent decision of a co-ordinate branch of this court (People v. Miner, reported in 2 Lans., 396).
This case stands alone in conflict with the English and American authorities I have cited above. This case, it is urged by the counsel for the defendants, is conclusive upon this court, upon the doctrine of stare decisis.
. I am not wanting in respect to this doctrine—never when it comes from a superior court, less so only in degree when it proceeds from a court of co-ordinate authority, especially so, one for whose learning and ability I entertain the most profound respect. But I can only decide this case upon the honest exercise of my own best and deliberate judgment, and upon my own clear convictions of well settled law.
*97 The authorities which led that able court to the result as reported have, upon a most thorough examination, clearly established in my mind a contrary conclusion.
The proposition stated in that opinion, and laid down as the basis of the decision, is as follows: “But it seems to be considered in the English chancery that no property of a corporation is considered charitable, unless it has been given to the corporation by the government or individuals, to be devoted to the use of the public.”
“Hence,” says the opinion, “money raised by taxation is not within the control of the court ” (p. 408).
The learned judge then proceeds to cite the case of Attorney- General v. Heelis as authority for the rule laid down in that case, and says: " It proceeds upon the distinction suggested, and is directly in point, and against the power of the court to intervene in cases of trusts not charitable."
We have previously shown that the case of Attorney-General v. Heelis was not law when it was pro nounced by Sir John Leach ; that it was expressly reviewed and overruled by the cases of Attorney-General v. Mayor of Dublin, in the House of Lords, and by the Attorney-General v. Eastlake, by the lord chancellor, and is found in conflict with nearly every other English and American decision.
In an examination of the same English cases by the late Judge Duer, he said, “ That the examination he had given to those (English) cases justified him in saying that the general rule to be extracted from them was this, that when the act of a municipal corporation . .. . affects injuriously the public at large—that is, the entire community over which the corporate jurisdiction extends—the attorney-general is a necessary party to the prosecution of the suit, and that it is only where the act, which in this sense is a public injury to par *98 ticular individuals, that the action can be maintained in their names; ” and he added that this rule “ had a solid foundation of principle, and was sustained by very sound reasons of public policy.
It appears to me that the case of Duer, supra, is supported by the following cases in this State: Doolittle v. Supervisors of Broome, 18 N. Y., 162; Roosevelt v. Draper, 23 N. Y., 318; 16 How. Pr., 100; 7 Abb. Pr., 158; 10 Id., 144; 32 Barb., 102; and also 50 Penn. St., 100.
I have had put into my hands a newspaper report of a case upon this same point, decided in the State of Missouri.
It appears in the St. Louis Republican of the date of July 13, 1873. In that case the right of the attorney-general to bring an action in the name of the people was fully discussed.
The English and New York authorities were all reviewed. The conclusion arrived at was the same as is given in this opinion ; and the case of the People v. Miner, in 2 Lans., was entirely dissapproved as authority.
If the views of the law I have expressed are sound, then it may be laid down as a general proposition, that in a court of equity, if the case is one of public trust, created by statute ; and, if there has been an abuse or breach of the trust by a public officer, whether appointed by statute or otherwise, unless the statute has empowered some one else to sue, or has declared or created a title to the moneys or property taken away or misappropriated, to be in some other person or body, the remedy by suit is in the people by their attorneygeneral.
And various cases are found in the English authorities, in cases of breach of trust, where, though an individual may sue for a private injury done to his inter *99 ests, the State has a concurrent right to prosecute, and this right is not affected by the private action.
It is urged upon the argument by the defendants' counsel, that even if relief can be had against the defendants in the name of the attorney-general, the remedy is only in the court of chancery; that this action is an action of law; that the complaint is, in form, strictly and only one in an action at law.
It is true the demand at the close of the complaint is for a judgment for money alone; and it is equally true, that the complaint is an anomaly in the system of pleading, and it may be said is not according to any prescribed form of past or present practice, and I think it is also true, that it is the court of equity that has jurisdiction of this class of actions. I am disposed to hold that upon the great principles of natural equity, such an action can be sustained, even in the absence of precedent or authority. It was held in the case of the People v. Aspinwall, supra, “that nothing is required to bring a case within the jurisdiction of chancery, tut that moneys are held for a public trust, and a breach of that trust; and see, also, Attorney-General v. Poole, 8 Clark & F., 409.
If we are right in the views of the law of equity which we have discussed, it is still seen that facts are set forth in the body of this complaint sufficient to show an equitable cause of action, though the demand of a relief has the characteristic of an action at law.
But we are taught by the more liberal system of pleading now in force, adopted by the Code, that it was expedient that the former system of pleading, as in cases at common law, should be abolished ; and the distinction between legal and equitable remedies should no longer continue ; and that a uniform course of proceeding is established.
The kind of action or proceeding, however, still depends on the nature of the right to be enforced, or *100 wrong to be remedied. This must be shown by the facts which constitute the cause of action.
If these are sufficient, the form of the demand of relief does not destroy their force or change the character of the action. The complaint, certainly, is inartistic for an equity action, and perhaps for any other, but an error in the demand of relief neither changes the character of the action, nor affords ground for demurrer. Whatever imperfections may be found to exist in the form of the pleading, or as to want of certainty in its statement; or for surplusage in statement, might be the subject of a special motion, but these objections are not available before us.
There are several other objections raised which are merely technical, as to the form of action, and to the form of the pleading, but they are not so material as to require discussion or to make them a ground for sustaining the demurrers.
From a review of all the cases in England, and in this State, to which I have had access, I have come to the conclusion, and hold, that the attorney-general is authorized to bring actions in the name of the people of this State for breaches of trust against all classes of public officers, and in cases of trusts for public purposes. That in the exercise of this right, he is not limited to actions against municipal officers, but it extends especially to special boards, or commissions appointed by the legislature to exercise a public trust; that the right to prosecute does not depend upon the source from which the moneys used have been derived ; whether from taxation, from creating liabilities to taxation, or from more limited sources, as from gifts, bequests, or donations ; but that it depends upon the purpose or object to which the fund is to be applied ; and, that the case at bar, being a public purpose, it comes within this rule.
*101 I hold, therefore, that upon the statement of facts set forth in the complaint, the defendants Tweed and Connolly, together with A. O. Hall, were by the legislature constituted a special public commission as a board of auditors, and were clothed as such board, with a public trust. That the moneys in question having been raised by them in the exercise of such public trust, it became their duty to apply them to the designated public use ; that they were guilty of a breach of that duty, and a breach of said trust, in the entire omission, as such board, to audit the accounts in question, and in the illegal delegation of this duty to irresponsible agents ; that they were guilty of a breach of duty in raising an amount of money greatly in excess of the public necessities, and in corruptly and fraudulently colluding and conspiring with others in the appropriating of and in using the said moneys upon false and fictitious claims, and in allowing large amounts thereof, through such instrumentalities, to be taken, used and appropriated to the individual use of the defendant Tweed ; that it is the duty of the people of the State to prosecute for this breach of trust by their duly constituted officer, the attorney-general; that this action is lawfully prosecuted ; that this court has jurisdiction of the said action ; and that the complaint contains facts ' sufficient to constitute a cause of action.
The result is, in my opinion, that the order of the special term overruling the demurrers, in both cases, should be affirmed, with costs.